Marlin GHASSOMIANS, Plaintiff,

v.

ASHLAND INDEPENDENT SCHOOL DISTRICT, et al, Defendants.

No. Civ.A. 96–153.

United States District Court,
E.D. Kentucky,
Ashland Division.

March 25, 1998.

Ron L. Walker, Jr., Brooks & Fitzpatrick, Lexington, KY, for plaintiff.

William H. Fogle, Mt. Sterling, KY, for Ashland Independent School District Board of Education, defendant.

Robert L. Chenoweth, Chenoweth Law Office, Frankfort, KY, for Steve Hall, defendant.

## ORDER

WILHOIT, Chief Judge.

Plaintiff is an Iranian born woman who works as a teacher in the Ashland Independent School District. She is suing her employer and former principal, Steve Hall ("Hall") for the unpleasant conditions and bad treatment she received from Hall[1]. This matter is currently before the Court on two separate summary judgment motions filed by Hall and Defendants, Ashland Independent School District and Superintendent Larry Graves [Record Nos. 32 & 34]. For reasons to be explained, the Court finds that said motions should be granted.

### A. Facts

#### 1. Background:

Marlin Ghassomians was born in Iran but came to the United States in 1968. She received her Associate, Bachelor, and Master degrees from Kentucky colleges. She has worked in the Ashland Independent School system ("the school system") since 1977 and is certified in Elementary Education (1–8), Special Education (1–8) and Social Studies (7–12).

When she first started working for the school system in 1977, Plaintiff was as-signed as a Special Education Teacher to the Ashland Day Treatment Center[2] ("the treatment center") where she remained three years. She was then transferred to Verity Middle School to teach special education. In early 1992, she applied for and was rehired at the treatment center as a social studies teacher.

Upon assuming the social studies position in the 1992–93 school year, Plaintiff was assigned duties as a regular classroom teacher in a self-contained classroom where she taught all subject areas. The staff at the treatment center included Plaintiff, a full-time and half-time special education teacher, a full-time aide, another full-time teacher and a principal. Plaintiff contends that she always performed her duties there in a proficient and satisfactory manner and without any questioning of her credentials.

In late 1993, the principal at the treatment center retired and the position was filled shortly thereafter by Hall. The administration instructed Hall to shape the program up and believed his job depended on his doing just that. He came to the treatment center in January 1994 and remained until the end of the 1995–96 school year.[3] It was during Hall's brief tenure there as principal that Plaintiff contends a hostile work environment existed.

#### 2. Disparate Treatment:

Plaintiff says Hall started causing problems for her almost immediately. It started when he asked her to bring him her credentials. Hall says he asked for these because he was concerned that students in grades 9–12 taught by Plaintiff would not

---

1. In her supplemental memorandum in support of summary judgment, Plaintiff states that her claims are also premised on the ill treatment she received from a co-worker, Susie Daniels.

2. The Ashland Day Treatment Center is a facility providing educational services to approximately 30 troubled children placed in the facility by the courts.

3. Sometime during the 1995–96 school year, the state terminated its contract with the Ashland school system for services at the treatment center. Thus, the staff at the treatment center including both Defendant Hall and Plaintiff Ghassomians were transferred to other jobs at other schools at the close of the school year.

receive credit for Plaintiff's classes as she was only certified to teach grades 1–8. He consulted with curriculum coordinator, Glenn Riedel ("Riedel"), and Superintendent Kathleen Al–Rubaiy ("Al–Rubaiy"), on the issue. He then held a conference with Plaintiff and Riedel where Plaintiff was told she would have to be transferred because she was not certified in secondary education. Defendants say the matter was finally resolved when Plaintiff took a class at Morehead State and received the proper certification. Plaintiff says she resolved the matter by called Dr. Zaheer at the Dept. of Education Certification Division who told her she was certified to teach at the treatment center even though she was not certified in secondary education. Dr. Zaheer sent a letter to this effect to Hall and Al–Rubaiy. Afterwards, Plaintiff says Hall began monitoring her class regularly and checking her papers out of fear that she was not certified.

Once the certification question was resolved, Plaintiff says Hall then changed her teaching assignment even though the 1994–95 school year had already begun. Instead of teaching in a self-contained class room as before, she was assigned first to teach math and science and later to teach math full-time even though she was hired at the treatment center to teach social studies. Susie Daniels ("Daniels") another full-time teacher and a friend of Hall's, however, got to stay in language arts, however. Defendants say that this change was due to recent changes in teaching methodology and class room assignments. When Plaintiff complained of the changes, the Superintendent explained to her that social studies had been de-emphasized as a result of standardized test scores.

For the 1994–95 school year, Plaintiff's assignment was again changed to her dismay after Williams was transferred out of the treatment center. This time she was assigned as a self-contained regular classroom teacher with duties as a special education teacher. This extra duty required her to complete documentation for the special education students without any additional compensation. Defendants say this change was the result of budget cuts that had forced the transfer of the only other special education teacher at the school. Hall says he did not change Plaintiff's assignment until after consulting with the central office administration.[4]

According to Plaintiff, the special education assignment was not the only detrimental change in her employment that school year. First, she claims Hall refused to let her leave campus for lunch like the other teachers. Defendants say Hall took this matter up with Glenn Riedel who then gave Plaintiff express permission to leave for lunch. When she finally received such permission, Hall began monitoring her return from lunch though he did not do so for any one else. Plaintiff also complains that Hall prohibited her from leaving campus early, refused to consider her for school errands or to take students with her on errands; and monitored her return from lunch. Plaintiff says she was forced to change her classroom during the school year, refused permission to use the instructional aide, and required to review student records in Hall's office. Furthermore, Plaintiff complains that Hall belittled her and other women at facility meetings and failed to discipline students making disparaging remarks about her.

In September 1994, Plaintiff reported that a student had taken her private dia-

4. Plaintiff insists that the Defendants transferred Williams in retaliation for her friendship with Plaintiff. As proof of this illicit motive, Plaintiff notes that Williams was reassigned even though she was certified in special education while Susie Daniels was allowed to remain. Daniels was only certified in physical education. Williams testified, however, that at the time of her transfer, she had the least seniority of any other staff member. According to Williams, Plaintiff performed the same duties that Williams had as special education teacher when Plaintiff took over this assignment.

ry[5] out of her desk. The diary was eventually turned over to Hall who found disparaging remarks about himself therein. He copied the pages referring to him and turned those copies over to Glenn Riedel. Plaintiff says Hall refused to return the diary to her until she went to Superintendent Al–Rubaiy who intervened. Hall says he discussed the matter with Glenn Riedel and subsequently returned the diary to Plaintiff that same day. In any event, Plaintiff went to Al–Rubaiy after getting her journal back. Al–Rubaiy told Hall to return the copies as well which he did. Al–Rubaiy then assured Plaintiff that the situation had been resolved.

In September 1994 and again in March 1995, Plaintiff filed a complaint with Al–Rubaiy about Hall's general treatment of her but did not mention her suspicions of ethnic and sex discrimination in either complaint. Nevertheless, Plaintiff currently attributes Hall's treatment of her to his alleged disdain for her nationality and gender. Plaintiff does not contend that Hall made any racial slurs or directed any epithets at her but has alleged in her complaint that he failed to discipline students making such remarks. Further detail and references to specific testimony on this point is not provided.

### 3. Harassment:

In her March 1995 complaint, Plaintiff complained of sexual harassment. In particular, she claims that the staff held an after-hours birthday party for teacher Debbie Jones at the treatment center in September or October, 1994. For that party, Hall went to a local novelty store and purchased a box of penis shaped candles. He put one such candle in Jones' cake before bringing it into the room. According to the Defendants, the participants sang happy birthday to Jones and then left. Neither Hall nor Plaintiff made any comments about the candle at that time.

Others testified that all of the participants were laughing and no one seemed offended. Jones herself testified that she thought the candle was inappropriate but found it unoffensive. Plaintiff did not report the incident until March 1995.

Plaintiff says Hall acted just as badly at his own birthday celebration. When the staff gave him a cupcake shaped like a female doll, Hall placed a candle between the doll's legs and stated that he "wanted to be alone with his girl". Hall denies this incident occurred and other workers testified that they saw nothing improper on that occasion.

In addition to the candle incidents, Plaintiff stated in her complaint and deposition that Hall made repeated references, jokes and comments about sexual anatomy during the 1994–95 school year. On one occasion, Hall told the person manning the metal detector that "there's iron in there" when his pants zipper set the detector off. On still another occasion, a co-worker told him he'd "have to kiss butt" to get along with the administrator at which point Hall started making kissing sounds. Finally, Plaintiff says Hall referred to Jones as an "asshole" during a staff meeting. Though Jones confirmed this comment, she testified that it was made in a joking manner and did not offend her.

Plaintiff has testified that Hall never specifically propositioned her for any sexual favors or approached her in a romantic way. He never cornered her in a room or made sexually explicit statements or innuendos. He never did anything to make Plaintiff uncomfortable when alone with her. What bothered Plaintiff were the general things Hall said in the company of others.

After Plaintiff finally reported the candle incidents, Superintendent Al–Rubaiy ordered an immediate investigation into the matter. School Administrators noti-

---

**5.** The "diary" consisted of a yellow legal pad on which Plaintiff wrote her personal thoughts about various staff members.

fied Plaintiff of their intent to investigate and subsequently interviewed various employees including Plaintiff, Hall, and Jones, among others, on March 20 and 21, 1995. The Administrators recommended to Al-Rubiay that Hall be reprimanded for his actions at the party. A formal reprimand was issued on April 27, 1995. They then scheduled a sexual harassment/discrimination seminar for Hall and the rest of the administration to attend.

According to Plaintiff, none of the administration's remedial actions were disclosed to her. She says her requests for the results of the investigation were not answered nor was she told what actions were taken. Furthermore, after making her report, Plaintiff says Hall warned others to "watch their backs" around Plaintiff and insisted on having a witness present whenever he talked to her.

### 4. Andrea Williams

At the December 18, 1997 pretrial conference, the Court gave the parties permission to depose one more essential witness, Plaintiff's friend and former co-worker, Andrea Williams [Record No. 55]. The Court ordered the parties to supplement their memorandums after doing so. Williams' testimony confirmed a number of important points for both parties.

Things ran smoothly at the treatment center until Hall arrived. He made major changes almost immediately upon taking over as principal which neither Plaintiff nor Williams liked. He took away Williams' aid of four years and formally reassigned her to serve everyone though, in reality, she became Hall's personal aid and did most of his work. Williams found Hall immature, difficult to get along with and unpredictable.

Hall was good friends with another teacher at the treatment center, Susie Daniels. Neither of them liked Plaintiff and warned Williams to "watch her back" and not get too close to her. Williams initially kept her distance from Plaintiff because of Hall and Daniels' warnings but later befriended Plaintiff. When she did, Daniels refused to associate with Williams as well.

Daniels and Plaintiff had at an "at odds" relationship from the beginning. Daniels would not ride in the same car as Plaintiff and would not sit in any chairs in Plaintiff's class room. She would not go to lunch with Williams if Plaintiff was going. She even hung up an ocean scene outside Plaintiff's class room after Plaintiff's son died by drowning. Williams complained of this treatment to Hall who simply told her he "could not make Daniels like" Plaintiff.

Williams remembered Hall screaming at Plaintiff on one occasion over $10 she owed to central office. He asked to see her records and created an incident with either Plaintiff or Williams four or five times a week. She thought Hall was rude to Plaintiff on a few occasions. She remembers that Hall asked to see every teacher's certifications, however.

Williams verified that there was a dispute over whether Plaintiff and Williams could leave campus for lunch and, unlike the other staff, Hall would watch when Plaintiff and Williams would return. She confirmed that Hall acted inappropriately at two birthday parties and that Plaintiff seemed shocked at his conduct. Williams did not find his conduct worth reporting, though, and merely felt it inappropriate for a school setting. She also confirmed that Hall made kissing sounds when told he would have to "kiss butt" and the metal detector comment. She never heard Hall make any remarks about Plaintiff's ethnicity or direct any sexual conduct or statements at the Plaintiff.

Williams, like Plaintiff, resented many of the changes Hall made. At the same time Plaintiff was assigned to teach math, Williams was assigned to teach science full-time in addition to her special education work. This came after a budget cut at the treatment center and the elimination of the half-time special education teacher position. Susie Daniels got to stay

in language arts, however, which Williams disagreed with.

Williams disagreed with Hall's efforts to change the special education teaching method from self-contained class-rooms to a "main streamed" program where the special and regular education students attended class together even though such changes were consistent with recent changes in federal law. At the time she was transferred, she had the least seniority of all the teachers there and she was not replaced. Upon leaving, Plaintiff assumed the special education duties and performed the same duties that Williams had.

### B. Summary Judgment Standard

Under Rule 56 of the Federal Rules of Civil Procedure the Court must view the evidence in the light most favorable to the nonmoving party, in this case the Plaintiff. Thus, when examining the record the Court will resolve doubts and construe inferences in favor of the Plaintiff in an effort to determine if any genuine issues of material fact exist. However, in a series of decisions commonly referred to as the "trilogy", *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986), the U.S. Supreme Court emphasized that "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252, 106 S.Ct. 2505. In short, the "trilogy" requires the nonmoving party to produce specific factual evidence that a genuine issue of material fact exists.

The United States Court of Appeals for the Sixth Circuit has interpreted the "trilo-

gy" to mean that the nonmoving party must produce enough evidence, after having had a reasonable opportunity to conduct discovery, so as to withstand a directed verdict motion. *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1477 (6th Cir.1989). As that Court stated, "the movant could challenge the opposing party to 'put up or shut up' on a critical issue ... [and] if the respondent did not 'put up', summary judgment [is] proper." *Id.* at 1478.

### D. Eleventh Amendment Immunity:

██ Defendant Graves and the School District insist that their actions are shielded with Eleventh Amendment immunity. The Eleventh Amendment prohibits federal courts from hearing damage suits against states and arms of the state that have not waived their immunity. *Tolliver v. Harlan County Bd. Educ.*, 887 F.Supp. 144, 147 (E.D.Ky.1995). It does not protect cities, counties or the state's political subdivisions, however. *Id.* The question, then, is whether the Ashland Independent School System is an arm of the state.

██ Although Kentucky's Supreme Court has eliminated any doubt that local school boards are arms of the state for sovereign immunity purposes, *Clevinger v. Board of Education of Pike County*, 789 S.W.2d 5, 10–11 (Ky.1990)[6], the consensus of federal judges in this district is that local school boards are sufficiently autonomous to fall outside the Eleventh Amendment's protection. *Blackburn v. Floyd County Bd. of Educ.*, 749 F.Supp. 159, 162, (E.D.Ky.1990); *Tolliver*, 887 F.Supp. at 147; *Creager v. Bd. of Educ.*, 914 F.Supp. 1457, 1461 (E.D.Ky.1996); *Doe v. Knox County Bd. Educ.*, 918 F.Supp. 181, 183 (E.D.Ky.1996); but see, *Adkins v. Bd. Educ. of Magoffin County, Kentucky*, 982 F.2d 952, 954 & 957 (6th Cir.1993) (declining to determine whether Eleventh Amendment immunity protects board of

---

6. Specifically, the Supreme Court noted that "[t]here has never been any question about the status of a local school board as an agency of state government...." *Clevinger*, 789 S.W.2d at 10–11.

education but acknowledging Judge Hood's order dismissing the Board and Superintendent on the grounds that the Eleventh Amendment shielded them from money damage claims). In reaching that consensus, they adopted Judge Hood's reasoning that *Clevinger* improperly interpreted United States Supreme Court precedent "as holding that local government units protected by state sovereign immunity are not 'persons' under § 1983"—a position subsequently rejected by the United States Supreme Court in *Howlett v. Rose*, 496 U.S. 356, 110 S.Ct. 2430, 110 L.Ed.2d 332 (1990)[7]. *Blackburn*, 749 F.Supp. at 161; *Creager*, 914 F.Supp. at 1461; *Tolliver*, 887 F.Supp. at 146. Rather, the question of who is a person for § 1983 purposes is a matter of federal law. *Blackburn*, 749 F.Supp. at 161. Applying a method of analysis developed by the third circuit and approved by the sixth circuit, then, Judge Hood concluded that local school boards were, in fact, autonomous of the state for Eleventh Amendment purposes regardless of any sovereign immunity issue. *Id.*

The Defendants correctly argue that Kentucky has revamped its educational system through the enactment of KERA in the seven years since Judge Hood made the *Blackburn* evaluations. Defendants insist that these changes have expanded state control over education. What the Defendant fails to realize, though, is that Judge Bertlesman in 1995 and Judge Coffman in 1996 rejected this very argument after considering KERA's changes. *Tolliver*, 887 F.Supp. at 147; *Doe*, 918 F.Supp. at 183. Judge Bertlesman concluded that KERA actually attempts to decentralize much of the decision-making process. *Tolliver*, 887 F.Supp. at 147. Consequently, he concluded it did not justify a departure from Judge Hood's prior

reasoning. *Id.* This Court agrees. Thus, in conformity with the decisions of Judges Hood. Bertlesman and Coffman, the Defendants' summary judgment motion based on the Eleventh Amendment immunity must fail.

### E. Hall's liability under § 2 of the Kentucky Constitution, Title VII and KRS Ch. 344:

 Hall argues and Plaintiff concedes that she has no cause of action against Hall in his individual capacity for violations of Section 2 of Kentucky's constitution. Similarly, Hall insists and Plaintiff agrees that the sixth circuit's recent decision in *Wathen v. General Electric*, 115 F.3d 400 (6th Cir.1997), precludes recovery from Hall in his individual capacity on Plaintiff's Title VII and state civil rights claims as Hall is merely a school system employee to whom liability does not extend. The Court having been sufficiently advised, Hall's summary judgment motion shall be granted as to Plaintiff's claims based on Section 2 of the Kentucky Constitution, Title VII, and KRS Ch. 344.

### F. Fourteenth Amendment Claims:

#### 1. The School Board and Superintendent Graves:

The School District has moved for summary judgment on Plaintiff's Fourteenth Amendment Equal Protection Claim on the grounds that Hall is the only person whose actions are in question and there is no respondeat superior liability under § 1983. Plaintiff does not contest this rule but insists that she is not asserting a respondeat superior theory. Rather, she says the School District is accountable because her constitutional deprivations were

7. In *Howlett,* the United States Supreme Court concluded that state sovereign immunity laws, without more, cannot preclude civil rights actions. Consequently, the question of who is a person amenable to suit under § 1983 is a matter of federal law. 110 S.Ct. at 2443. While it is true that arms of the

state cannot be considered "persons" for § 1983 purposes because of their Eleventh Amendment immunity, *Blackburn,* 749 F.Supp. at 161, Judge Hood concluded the Kentucky Supreme Court's opinion that school boards were such an arm was not controlling in light of *Howlett. Id.*

the product of an official policy or custom of the school district.

■ In *Monell v. Dept. of Social Services,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), the Supreme Court held that local government bodies can be sued under § 1983 when the allegedly unconstitutional action "implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." *Id.* at 690, 98 S.Ct. 2018. Here there is no official policy, ordinance or regulation endorsing discrimination at play. Nevertheless, local governments are also liable for deprivations caused by governmental "customs" regardless of whether such custom has been formally approved through official channels. *Id.*

■ Not every discretionary action taken by an official can be deemed a governmental "custom". Rather, a "custom" is some action or position taken by someone with final policy making authority in that area of the local government's business. *City of St. Louis v. Praprotnik,* 485 U.S. 112, 126–27, 108 S.Ct. 915, 99 L.Ed.2d 107 (1988). In other words,

> the authority to make municipal policy is necessarily the authority to make final policy. [Internal citation omitted]. When an official's discretionary decisions are constrained by policies not of that official's making, those policies, rather than the subordinate's departures from them, are the act of the municipality. Similarly, when a subordinate's decision is subject to review by the municipality's authorized policymakers, they have retained the authority to measure the official's conduct for conformance with their policies. *If the authorized policymakers approve a subordinate's decision and the basis for it, their ratification would be chargeable to the municipality because their decision is final.*

*Id.* 485 U.S. at 127, 108 S.Ct. 915 (emphasis added).

■ State law determines who has final policy-making authority. In this case, Plaintiff notes that under Kentucky statutory law, the school superintendent has such final authority in personnel matters. Plaintiff contends that because Hall discussed and sought approval for his actions regarding Plaintiff's employment with Superintendent Al–Rubaiy, she ratified his decision and therefore created an unofficial policy or custom of discrimination. What Plaintiff fails to consider is that key phrase in italics noted above. The policymaker's ratification of a subordinate's actions are not chargeable to the local government unless she approved both the decision **and the basis for it.** "Simply going along with discretionary decisions made by one's subordinates . . . is not a delegation to them" of final policy making authority. *Id.* The Superintendent can rightfully presume that a subordinate is simply trying to comply with official policies in place when exercising his or her discretion. *Id.* Al–Rubaiy's "mere failure to investigate the basis of [Hall's] discretionary decisions does not amount to a delegation of policymaking authority where (as here) the wrongfulness of the subordinate's decision arises from" some unstated rationale. *Id.*

There is no evidence in the case *sub judice* that Al–Rubaiy or anyone else in the Administration knew or had reason to know that Hall's actions in altering the conditions of Plaintiff's employment were motivated by sex and/or ethnic discrimination. While Plaintiff complained of Hall's general treatment of her long before filing a sexual harassment complaint, she did not bring the discrimination issues to the administration's attention. For all the administration knew, Hall and Plaintiff had a personality conflict. The fact that Al–Rubaiy responded promptly to the sexual harassment complaint and sanctioned Hall for his actions demonstrates that she would not have ratified such discrimination had she known of it. Furthermore, her prompt intervention in the diary incident, further demonstrates her respect for

Plaintiff's rights. Hall noted legitimate reasons for all of his personnel actions and there is no evidence that he offered anything other than those reasons to the Superintendent. Absent knowledge of the allegedly discriminatory basis of Hall's actions, it cannot be said that Al–Rubaiy ratified such discriminatory conduct. Simply put, there is no policy or custom at play here so the school district cannot be liable under § 1983.

### 2. Defendant Hall

Hall insists he is entitled to summary judgment on Plaintiff's Fourteenth Amendment claims for two reasons. First, he cannot be held accountable for such violations in his individual capacity as the Fourteenth Amendment does not reach the conduct of individual citizens no matter how wrongful or discriminatory. Second, Plaintiff has failed to produce any evidence of disparate treatment.

For her equal protection claim, Plaintiff averred that

> The Defendants' actions, as described above, discriminated against the Plaintiff in the conditions, privileges and terms of her employment because of her birth origin and gender/sex in violation of Plaintiff's rights under the Fourteenth Amendment to the United States Constitution.

[Pl.'s Cmplt. at Para. 34]. Hall correctly notes that Plaintiff cannot bring a Fourteenth Amendment claim directly against him. *Thomas v. Shipka*, 818 F.2d 496, 503 (6th Cir.1987). When one reads the four corners of the complaint, however, one sees that Plaintiff has not brought her constitutional claims directly. Rather, paragraph one clearly states that jurisdiction is premised on 42 U.S.C. § 1983—the proper vehicle for Plaintiff's constitutional claims against a state actor. Thus, this direct action argument is meritless.

Hall's second argument bears more weight. Plaintiff has distinct rights under both the Fourteenth Amendment equal protection clause and Title VII to be free of employment discrimination. *Gutzwiller v. Fenik*, 860 F.2d 1317, 1325 (6th Cir. 1988). Nevertheless, the showing she must make to succeed on either theory is the same. *Gutzwiller*, 860 F.2d at 1325. Both require proof that the Defendants intentionally or purposefully discriminated against her because of her membership in a suspect class. *Id.* In other words, Plaintiff must show that she would not have suffered this adverse treatment but for her sex and/or national origin. *Id.* In light of this identity of issues, the Court shall consider the merits of Plaintiff's Fourteenth Amendment equal protection and Title VII disparate treatment claims together even though the Court believes Hall has no Title VII liability and the school board has no Fourteenth Amendment accountability.

### G. Disparate Treatment

As previously explained, disparate treatment occurs when an employee receives less favorable treatment for a constitutionally impermissible reason. *Johnson v. City of Fort Wayne*, 91 F.3d 922, 931 (7th Cir.1996). "Proof of discriminatory motive is critical" to such a claim "although it can in some situations be inferred from the mere fact of differences in treatment." *Id.* In this case, Plaintiff has not produced any direct evidence of illicit motive so her claims are subject to analysis under the three part test set out in *McDonnell Douglas Corporation v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *Johnson*, 91 F.3d at 931; *Texas Dept. Of Community Affairs v. Burdine*, 450 U.S. 248, 254, 101 S.Ct. 1089, 1094, 67 L.Ed.2d 207 (1981).

 Under the McDonnell Douglas test, Plaintiff must make a prima facie case by proving (1) she belongs to a protected class; (2) did satisfactory work; and (3) suffered adverse employment action; while (4) "similarly situated" non-protected "employees received more favorable treatment". *Johnson*, 91 F.3d at 931; *Jachyra v. City of Southfield*, No. 95–1009,

97 F.3d 1452, 1996 WL 520795 (6th Cir. Sept.12, 1996); see also, *Davis v. Monsanto Chemical Co.*, 858 F.2d 345, 347 (6th Cir.1988) (finding that black complainants asserting race discrimination claim had to show they were treated less favorably than similarly situated white employees). Upon making a prima facie case, the burden shifts to the employer to "articulate a legitimate, nondiscriminatory reason for its allegedly biased employment decision". *Johnson*, 91 F.3d at 931. The burden then shifts back to the plaintiff who must then prove the proffered reasons are pretextual by showing that (1) they lack a factual basis; (2) were not the real reason; or (3) did not suffice to warrant the adverse treatment. *Id.* Despite these shifting burdens, Plaintiff always bears the ultimate burden of persuasion in proving intentional discrimination. *Burdine*, 450 U.S. 248, 253, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207; *Jachyra*, 1996 WL 520795.

■ Plaintiff initially implied that she was singled out for adverse treatment because of her sex and national origin when her teaching assignments were changed repeatedly, her credentials were questioned, and she was not permitted to leave campus early or for lunch. Williams' testimony shows, however, that she too had her teaching assignments changed and that all teachers were required to produce their certification. She did confirm, however, that Plaintiff was not allowed to leave early for lunch until the matter was brought to Hall and Riedel's attention. Once permitted to leave early for lunch, Williams testified that Hall watched the clock for both Williams' and Plaintiff's return. Williams further testified to the general animosity she and Plaintiff received from Hall and Daniels upon becoming friends. In light of this testimony, Plaintiff associated any similar treatment towards

Williams as retaliation for befriending the Plaintiff.

This Court does not believe Plaintiff has stated a prima facie case. Though Plaintiff claims to have been treated differently from her co-workers, these co-workers were also women. The ethnicity of those receiving allegedly preferential treatment has never been established. There is no evidence supporting any presumption that gender and/or ethnicity based animus played any role in the Defendants' employment decisions. As is more fully explained later in this opinion, the most this Court can say at this juncture is that Hall, Daniels and Plaintiff had a serious personality conflict. Because the Court cannot say that Hall would have treated Plaintiff any differently "but for" her gender and/or ethnicity, the Defendants are entitled to summary judgment on her equal protection/disparate treatment claim. *Gutzwiller*, 860 F.2d at 1325.

■ Assuming for the moment that Plaintiff has stated a prima facie case, the Defendants have articulated legitimate non-discriminatory reasons for all of the changes in her teaching assignments other than her right to leave for lunch. They attributed the transfers in her teaching schedules to budget cuts and changes in federal regulations. Plaintiff has offered nothing to prove these reasons false or insufficient. For all of the foregoing reasons, then, the Court believes that the Defendants are entitled to summary judgment on Plaintiff's equal protection/disparate treatment claims.

### H. Hostile Work Environment

■ Plaintiff claims that Hall's conduct towards her created a hostile work environment based on her gender and national origin in violation of Title VII.[8] Title VII

---

8. In their motions, the Defendants addressed the national origin and sex based claims separately. Plaintiff correctly notes, however, that these claims must be considered together and the evidence as to each claim aggregated. *Hicks v. Gates Rubber Co.*, 833 F.2d 1406,

1416 (10th Cir.1987). For discrimination against Iranian-born women may exist "even in the absence of discrimination against" Iranian-born men or women of other national origins. *See, id.*

hostile work environment harassment occurs when there is a severe and pervasive permeation of the work place with discriminatory intimidation, ridicule, and insult that unreasonably interferes with an employee's work performance or creates an intimidating, hostile or offensive work environment. *Harris v. Forklift Systems,* 510 U.S. 17, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993); *Donaldson v. American Banco Corp.,* 945 F.Supp. 1456, 1461 (D.Col.1996). The utterance of a single derogatory remark will not suffice. *Erebia v. Chrysler Plastic Products Corp.,* 772 F.2d 1250 (6th Cir.1985). Instead, the environment must be "so heavily polluted with discrimination as to destroy completely the emotional and psychological stability of minority group members." *Id.* at 1254.

██ To succeed on a hostile work environment claim, Plaintiff must show first and foremost that she belonged to a protected class and endured unwelcome verbal or physical conduct because of her membership in that class. *Walk v. Rubbermaid Inc.,* 913. F.Supp. 1023 (N.D.Ohio 1994), *aff'd,* 76 F.3d 380, 1996 WL 56203 (6th Cir.1996) (unpublished opinion). Plaintiff must also prove the harassment was severe or pervasive enough that a reasonable person would perceive the work environment as hostile or abusive. *Scott v. Central School Supply,* 913 F.Supp. 522, 528 (E.D.Ky.1996). Hostility and abusiveness are determined from the totality of circumstances including the frequency of the alleged conduct, "its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Crawford v. Medina General Hospital,* 96 F.3d 830 (6th Cir.1996).

██ In this case, most of the comments and conduct in question were not sexually charged. All of the comments and conduct appear to have been national origin neutral. As noted by Plaintiff, however, this does not necessarily preclude her Title VII claim. A court should consider all harassment and unequal treatment regardless of whether it lacks sexual or racial overtones when determining whether hostile work environment sexual or ethnic harassment existed. *Stahl v. Sun Microsystems,* 19 F.3d 533, 538 (10th Cir.1994); *Donaldson v. American Banco Corp.,* 945 F.Supp. 1456, 1461 (D.Col.1996). Nevertheless, such actions must still be based on sexual or racial discrimination for a cause of action to lie. *See, Sun,* 19 F.3d at 538; *Walk v. Rubbermaid Inc.,* 913 F.Supp. 1023, 1027 (N.D.Ohio 1994), *aff'd,* 76 F.3d 380, 1996 WL 56203 (6th Cir.1996) (unpublished opinion). In other words, Plaintiff must demonstrate that Hall would not have harassed her or treated her unequally but for the fact that she is a woman or a person of Persian national origin or both. *See,Sun,* 19 F.3d at 538; *Walk,* 913 F.Supp. at 1027 & 1028; *Donaldson,* 945 F.Supp. at 1461; see also, *Erebia v. Chrysler Plastic Products Corp.,* 772 F.2d 1250, 1258 (6th Cir.1985) (noting that "[t]he hostile work environment claim is not a disparate treatment claim that requires no showing of intent"). This she has not done.

The fact that most of the conduct in question is sexually and racially neutral, while not by itself dispositive, weighs against Plaintiff. Though she insists Hall's treatment of her was gender and/or ethnically based, she has offered little more than her opinion to support that claim which is insufficient to survive summary judgment. *Walk,* 913 F.Supp. at 1028. Hall's only sex-based comments or actions were the two birthday incidents and the metal detector comment—none of which were directed towards Plaintiff or any particular person.[9] While these incidents clearly demonstrate Hall's immaturity, lack of professionalism, and vulgarity,

---

9. Interestingly, the other women attending these parties testified that they did not feel offended, threatened or harassed by Hall's actions though they questioned its appropriateness.

this Court, like that in *Walk,* fails to see how these isolated incidents demonstrate that Hall treated Plaintiff the way he did because of her sex and/or national origin.

In *Scott,* 913 F.Supp. at 522, Judge Bertlesman found that the only conclusion he could reasonably draw from a supervisor's repeated displays of disrespect for a female employee was that they had a personality conflict aggravated by the company's poor management. *Id.* As there was no evidence that any of the disrespectful actions were based on sex or of a sexual nature, they could not by themselves support the plaintiff's hostile work environment claim. *Id.* Similarly, in *Walk* the mere fact that there was animosity between the parties and the defendant frequently used foul and abusive language, despite his direct statement to the plaintiff that he had "no time for you or your fucking menopausal bitches", did not prove the employer's conduct was based on the Plaintiff's sex. *Walk,* 1996 WL 56203 at *2. In the case *sub judice,* this Court can only conclude from the totality of circumstances presented, that Plaintiff and Hall had a serious personality conflict. It cannot say that this conflict was in any way based on her gender or national origin which is essential to her Title VII claim. For "[i]f the nature of an employee's environment, however unpleasant, is not due to her gender [or national origin], she has not been the victim of ... discrimination as a result of that environment." *Stahl,* 19 F.3d at 538.

Assuming for the moment that Hall's conduct would not have occurred but for the fact that Hall is a woman and/or person of Persian ethnicity, the Defendants insist that the conduct in question was not sufficiently severe or pervasive to constitute a hostile environment. The Court tends to agree. Although sex and race based comments and conduct need not be aimed at Plaintiff to constitute actionable harassment, the fact that none were directed at Plaintiff is somewhat indicative of their lack of severity. *Black v. Zaring Homes, Inc.,* 104 F.3d 822, 826 (6th Cir. 1997). As previously stated, there is no question that Hall's actions during the candle incident and some of his other alleged comments were unprofessional, inappropriate and offensive. Nevertheless, "Title VII was 'not designed to purge the workplace of vulgarity.'" *Id.citing Baskerville v. Culligan Internt'l Co.,* 50 F.3d 428, 430 (7th Cir.1995). In *Black,* for example, the sixth circuit determined that nine explicit sexually charged incidents spread over the course of seven months could not reasonably constitute actionable harassment. *Id.* at 827. Applying that case to the instant action, it would seem that the 2–3 sexually charged incidents at issue here, spread out over the course of 1½ school years are likewise insufficient—even when considered along with the employment changes Hall made that Plaintiff so disliked.[10]

As an additional matter, the School Board insists it cannot be liable for this alleged harassment even if it existed as it responded promptly to Plaintiff's harassment complaint. The School Board correctly notes that an employer can negate its liability by taking prompt remedial action upon learning of the harassment.[11]

10. In reaching this conclusion, the Court is mindful that Plaintiff felt she had been singled out for adverse treatment but the Court found no evidence to support her claims. Both she and her friend, Andrea Williams, testified that they disliked many of the changes Hall implemented even though those changes were consistent with changes in federal regulations. Other administrators testified that Hall was under direct orders to "shape up" the treatment center and his continued employment there depended on this. For whatever reason, Plaintiff "bucked" all of his attempts to implement these changes. This evidence further bolsters the Court's conclusion that Hall and Plaintiff's conflict was the product of personal and professional conflicts rather than sex or national origin discrimination.

11. In Plaintiff's supplemental memorandum, she argues for the first time that this case involves both co-worker harassment premised on Susie Daniels' conduct and supervisor harassment premised on Hall's conduct. This Court is mindful of the distinction between such classes of harassment and their impact

*Wathen,* 115 F.3d at 407; *Kauffman v. Allied Signal, Inc.,* 970 F.2d 178, 184 (6th Cir.1992). In this case, there was considerable delay between the candle incidents and the school board's actions but fault for this delay rests entirely with the Plaintiff. She did not report these incidents to the school board until many months later. When she did finally report it, the Superintendent launched an immediate investigation and notified Plaintiff of the same. Within only a few weeks, the administration verified the allegations, privately reprimanded Hall, and scheduled a sexual harassment seminar for Hall and other school officials to attend. Apparently, this effectively remedied the sexual misconduct as there are no allegations of any other sexually charged actions or comments after the administration got involved.

Plaintiff insists the situation was not adequately remedied by the school board's actions because Hall began insisting on having witnesses present when speaking to her and warned others to "watch their backs" around her.[12] Plaintiff also indicates that she was not notified of these results until filing this suit and disapproves of how the investigation was conducted since it revealed her complaints to her co-workers. She suggests that termination or suspension would have been a more appropriate remedy.

Regardless of her dissatisfaction with the school board's methodologies and Hall's defensive reactions, the fact remains that the administration promptly responded to her complaint and put an end to the sexual misconduct upon learning of it as required by law. *See, Kauffman,* 970 F.2d at 185 (rejecting Plaintiff's discontent with her employer's sexual harassment policy and failure to implement guidelines and training in the matter as grounds for deeming the remedial measures taken legally inadequate). The school board had no obligation to seek Plaintiff's approval of its remedial methods. *See, Id; See also, Blankenship v. Parke Care Centers, Inc.,* 123 F.3d 868, 874 (6th Cir.1997) ("a harassment victim may not dictate an employer's action against a co-worker"). Rather, it only had to take "reasonable corrective action" as judged by the frequency and severity of the conduct alleged. *Blankenship v. Parke Care Centers,* 123 F.3d 868, 872 (6th Cir.1997). Such remedial measures are considered reasonable unless they "manifest indifference or unreasonableness in light of the facts the employer knew or should have known." *Id.* at 873. Here, the employer knew that on at least one and possibly two occasions several months prior Hall made sexually provocative comments. Most of the employees interviewed stated that they found this conduct inappropriate but not offensive. After the reprimand, the sexual misconduct apparently stopped and any other post-response sex neutral conduct was apparently not brought to the school board's attention. Thus, the Court cannot say that the Defendants' response manifested indifference or unreasonableness to the Plaintiff's complaint.

on the employer's liability as enunciated in *Pierce v. Commonwealth Life Ins.,* 40 F.3d 796 (6th Cir.1994). In "supervisor harassment" cases, the supervisor is deemed an agent whose actions are directly attributed to the employer. *Id.* at 803. A supervisor is defined as a person who "serves in a supervisory position and exercises significant control over the plaintiff's hiring, firing or conditions of employment." *Id.* While Plaintiff insists that Hall had such control over her employment conditions, the record shows that the school district generally and the superintendent, specifically, controlled the terms of her employment. Furthermore, there is testimony in the record that Hall lacked authority to make employment decisions. Thus, the Court is not convinced that supervisor harassment principles apply here. Because the Court believes that Plaintiff's claim fails for other reasons, it need not resolve this question as it does not effect the final result.

12. It is not entirely clear from the pleadings when the "watch your back" comments were made. Plaintiff states that they were made after she filed her complaint but Williams testified that they were made much earlier and dissuaded her from befriending Plaintiff.

*E. State tort claims:*

Defendants have moved for summary judgment on Plaintiff's state tort claims. For reasons to be explained, the Court finds these motions meritorious.

**1. Defamation:**

■ Defendants insist that Plaintiff has only alleged slander per quod which requires proof of special damages. Defendants have failed to consider, however, the general rule that negative statements about a public school teacher's qualifications, efficiency, or competence are defamatory *per se* as injurious to the teacher's trade. John A. Glenn, Annotation, *Libel and Slander: Actionability of Statements Imputing Inefficiency or Lack of Qualification to Public School Teacher*, 40 A.L.R.d. 490, 493 (1971). Kentucky follows this rule. *See, Tucker v. Kilgore*, 388 S.W.2d 112, 114 (Ky.1964) (published words that prejudice one in his or her profession trade or business are actionable per se); *Landrum v. Midway College*, No. 95–CA–003225–MR, 1997 WL 335064 (Ky. App.1997) (same); & *Johnson v. Langley*, 247 Ky. 387, 57 S.W.2d 21 (1933). In *Landrum*, for example, the Kentucky Court of Appeals held that a College Dean's comments that a professor's grade assessment had been "unfair" was so injurious. *Id.* at 2. Thus, comments regarding Plaintiff's credentials in the instant action would likewise be actionable *per se* as prejudicial to Plaintiff's exercise of her profession.

Defendants insist that any statement by Hall was absolutely privileged as it was his duty to investigate and express his concerns about a teacher's credentials. In support of his argument, Hall cites *Matthews v. Holland*, 912 S.W.2d 459 (Ky.App. 1995). That case does indeed hold that school superintendents releasing information in connection with an express legal duty are absolutely immune in doing so. However, the defendant in *Mathews* was being sued for information provided to the Department of Education as required by statute for teachers whose contracts are not renewed. Defendants in the instant action have not cited any express statutory obligation in support of their defense. Thus, it is not immediately apparent that Hall was absolutely privileged.

Even if he was not absolutely privileged, the teaching profession's public character makes many of those same types of criticisms qualifiedly privileged. 40 A.L.R.d. at 493. Thus, criticisms from persons acting in good faith and having a genuine interest in school matters are typically shielded by such privilege. *Id.* at 494. This is particularly so for school officials and administrators who have an unquestionable duty and interest in their schools. *Id.*

■ Kentucky accepts the qualified privilege rule but it has its limits. *Tucker*, 388 S.W.2d at 115. A privilege that is not exercised in a reasonable manner for a proper purpose does not apply. *Id.* When the publication is actionable *per se* and no privilege or other defense applies, the presence of malice and damage is conclusively presumed. *Id.* at 116. Unlike defamation *per quod*, then, there is no need to prove special damages in the absence of privilege.

■ In *Johnson v. Langley*, 247 Ky. 387, 57 S.W.2d 21 (1933), the then high court declined to apply the privilege to a grandfather found liable for defaming a school teacher in a letter he sent to the Board of Education. In that letter, the grandfather complained that the teacher had bad eyes, lacked an education and did not do her duties at school. As a result of these problems, the grandparent complained that many persons kept their children out of the school the previous year and would do the same in the upcoming year if the teacher weren't removed. *Id.* at 22. At trial, the evidence showed that the teacher had been a competent teacher for more than two decades and that the reason most children, including the grandfather's grandchildren had missed school

was because the school board had made a rule that children could not return to school until vaccinated for small pox. This greatly upset the grandfather and many local parents who refused to have their kids vaccinated and blamed the teacher for this rule as she was the one who announced it. *Id.*

Because he had grandchildren in the school, had an interest in the school, and directed the letter to school officials, the grandfather argued his letter was qualifiedly privileged even though it turned out that all of his allegations were untrue. *Id.* at 25. Evaluating that claim. the appellate court acknowledged that a privilege does attach to communications in which the sender and recipient share a public interest that are "made in good faith without actual malice and with reasonable and probable grounds for believing them to be true". *Id.* The court further noted that malice can be inferred from the falsity of the statements. *Id.* Because all of the accusations in the letter were untrue and "based on idle rumors" that the grandfather made no effort to verify, the court concluded that the privilege did not extend to his letter as he had acted with malice and in bad faith. *Id.*

Hall contends that any statements he made about Plaintiff's credentials are qualifiedly privileged because he had a genuine, good faith concern that the children taught by Plaintiff would not receive credit for those courses as Plaintiff was not certified in secondary education. He only voiced that concern to his supervisors and Plaintiff herself. All of the persons privy to the communications surrounding Plaintiff's credentials were persons with a genuine public interest in school matters. The purpose of these communications was to clear this matter up. Plaintiff, of course, insists that Hall acted with ill will in questioning her credentials. She cites the fact that she had to get additional certification even though her qualifications were confirmed by the Board of Education as evidence that something else was at play here.

Unlike the grandfather in *Johnson,* the Court sees no evidence of ill will in Hall's actions. While his actions angered and inconvenienced Plaintiff, there is no evidence that she was singled out for unfair treatment. Her own witness and friend, Andrea Williams, testified that Hall questioned every teacher's certification. Having just taken this position and being under direct orders to shape up the treatment center, these were reasonable concerns. Absent evidence any evidence of ill will, Hall is entitled to qualified immunity on this claim.

## 2. Invasion of Privacy:

One of the first cases addressing this tort was *Wheeler v. P. Sorensen Manufacturing Co.,* 415 S.W.2d 582 (Ky.1967). The plaintiff sued her employer for publishing her pay stubs as part of an anti-union campaign. The purpose of the publication was to show that a person could receive better salary through hard work alone. Because these advertisements showed her wages, deductions, net take home pay and any raises she received, the plaintiff charged her employer with invading her privacy and causing resentment in her co-workers. The question for the court was whether publication of plaintiff's wage statements as an election tactic violated plaintiff's privacy rights. The then high court concluded that it did not.

In reaching its decision, the court noted that the invasion of privacy tort rests on an individual's right "to be left alone, to be free from unwarranted interference by the public or individuals in matters with which they are not necessarily concerned". *Id.* at 584. Truthfulness of the matter disclosed is no defense and malice is not required. *Id.* The court further defined the law as follows:

"[The right of privacy] is generally recognized as the right to be let alone, that is, the right of a person to be free from unwarranted publicity, or the right to

live without unwarranted interference by the public about matters with which the public is not necessarily concerned.' . . . In Restatement of the Law, Torts, § 867, p. 398, the actionable invasion is referred to as: 'A person who unreasonably and seriously interferes with another's interest in not having his affairs known to others or his likeness exhibited to the public is liable to the other.' It is defined in 41 AmJur., Privacy, § 2, p. 925 as: "*** the right of a person to be free from unwarranted publicity, and as the right to live without unwarranted interference by the public in matters with which the public is not necessarily concerned.' In 41 AmJur. Privacy, § 12, p. 934 the text says: 'The right of privacy is relative to the customs of the time and place, and it is determined by the norm of the ordinary man."

\* \* \* \* \* \*

It must be observed, however, that the right is not absolute. The rule defining the extent of the right is based on the premise that the standards by which the act is judged are that of a reasonable man. . . . [T]he right of privacy is relative to the customs of the time and place, and it is determined by the norm of the ordinary man. . . .

Many of the invasions of the right of privacy for which recovery has been sought are the result of unwarranted and humiliating methods put in motion by creditors to collect debts, or the unwarranted publications or use of the names or pictures to promote various enterprises.

*Id.* at 584–85. Applying those rules and observations to the case at hand, the court concluded that plaintiff had failed to state a cause of action as any invasion of her privacy was "reasonable and warranted" under the circumstances. *Id.* at 585. It based this decision on the fact that the employer had published this information to prevent its employees from unionizing by showing them that such was not needed to get ahead in the company. *Id.* The court

concluded that the published information was "a matter of interest" to both the employer and workers. *Id.* Furthermore, it did not hold the plaintiff in contempt or ridicule but showed she was "a competent, commendable and praiseworthy employee, entitled to a wage increase without union connection or association." *Id.*

In the thirty years since *Wheeler* was handed down, the law surrounding this tort has been refined a bit more. In 1981, the Kentucky Supreme Court adopted the general invasion of privacy principals found in the Restatement (Second) of Torts (1976). *McCall v. Courier–Journal and Louisville Times,* Co., 623 S.W.2d 882, 887 (Ky.1981). In particular, § 652A provides as follows:

(1) One who invades the right of privacy of another is subject to liability for the resulting harm to the interests of the other.

(2) The right of privacy is invaded by

(a) unreasonable intrusion upon the seclusion of another . . . ; or

(b) appropriation of the other's name or likeness . . . ; or

(c) unreasonable publicity given to the other's private life . . . , or

(d) publicity that unreasonable places the other in a false light before the public. . . .

*Id.*

Defendants contend that Hall's actions in reading and copying Plaintiff's "journal or diary" does not fit any of the activities described in § 652A(2). Plaintiff, on the other hand, says Hall's actions in implying that she was untrustworthy and in copying her journal infringed upon and unreasonably published her private life in violation of § 652A(2)(a) & (c). In support of her claim, Plaintiff merely insists that she has stated a claim without exploring the elements of such a claim or applying the case facts to them.

Any statement Hall may have made about Plaintiff's trustworthiness or creden-

tials to the rest of the staff or the Cabinet for Human Resources are not actionable under an invasion of privacy claim. Kentucky law clearly holds that the right to privacy does not prohibit oral statements. *McCall*, 623 S.W.2d at 887. Thus, Defendants are entitled to summary judgment on this claim to the extent Plaintiff seeks recovery based on Hall's "trustworthiness" statements to others. Plaintiff must sink or swim, then, based on the journal incident.

 A cause of action for unreasonable publication is further defined by § 652D which provides as follows:

Publicity Given to a Private Life

One who gives publicity to a matter concerning the private life of another is subject to liability to the other for invasion of his privacy, if the matter publicized is of a kind that

(a) would be highly offensive to a reasonable person, and

(b) is not of legitimate concern to the public.

Comment (a) states that publicity as used here is different from the publicity involved in a defamation claim. For defamation, publicity merely means a communication to a third party. In a publicity given to a private life claim, though, publicity means the information was passed along in a way substantially certain to become general knowledge either through dissemination to the public at large or to a multitude of persons. *Id.* Consequently, a communication to a single person or small group of persons does not constitute publicity while publication to a crowd or through the mass

media does. *Id.* Thus, passing the diary along to only one other person would not constitute publicity.[13]

 It seems the better cause of action is the intrusion of seclusion claim which is further defined in § 652B. That section provides that

One who intentionally intrudes, physically or otherwise, upon the solitude or seclusion of another or his private affairs or concerns, is subject to liability to the other for invasion of his privacy, if the intrusion would be highly offensive to a reasonable person.

Under that provision, the intrusion itself is actionable regardless of whether there is any subsequent publication or other use of the information obtained. *Id.* at Cmmt. b. The tort includes examination of a person's private affairs such as opening that person's private, personal mail. *Id.* Even then, however, the intrusion must be a substantial one that the ordinary person would find highly offensive. *Id.* at cmmt. d.

Here, the Court does not believe the ordinary person would deem Hall's actions substantially intrusive or unreasonable as there is no allegation that he came upon the journal or the information therein in an improper way. The journal was nothing more than a yellow legal pad which Hall recovered from a student. There is no indication that he should have known it was a journal and his curiosity in finding his name therein is understandable. Furthermore, there is no question that Hall returned the book and any copies he made

13. The Court is mindful of the comments acknowledgment that all courts may not follow this route of thinking. Specifically, comment (a) to § 652D states that

[w]hile the cases to date allowing recovery for the type of invasion of privacy covered by this Section have been confined to the giving of publicity to the private matter, the courts may decide to extend the coverage to a simple disclosure. Under § 652B, prying and intruding into the private affairs and concerns of another may be actionable, and

disclosure of the information so obtained will certainly add to the amount of damages. It remains to be seen whether a disclosure not equivalent to the giving of publicity will be actionable when the obtaining of the information was not tortious in character.

*Id.* Because there is no evidence that Hall came across this information in a tortious manner, however, the Court believes the better rule is to define publicity as requiring wide dissemination.

to Plaintiff the same day he received it at Superintendent Al–Rubiay's request.

### 3. Retaliation:

Plaintiff has not identified the source of her retaliation claim or made any effort to defend it. As noted by Defendant, KRS Ch. 344 has a retaliation provision in it but this cannot apply to Hall in light of the *Wathen* decision. Furthermore, Kentucky has no common law retaliation right of action. *Boykins v. Housing Auth. of Louisville*, 842 S.W.2d 527 (Ky.1992). Thus, this claim is subject to summary judgment.

### *I. Conclusion:*

Plaintiff has failed to show that Hall's personal conduct towards her, though unprofessional and frustrating, was motivated by anything other than personal animosity. Absent proof of discriminatory motive, Plaintiff's Title VII and Fourteenth Amendment claims must fail.[14] Furthermore, Hall is entitled to qualified immunity on the defamation claims and the privacy claims lack merit. For all of the foregoing reasons, then, the Defendants' summary judgment motions will be granted.

Accordingly, **IT IS HEREBY ORDERED AND ADJUDGED:**

(1) that the summary judgment motion of Defendant Steve Hall [Record No. 32] is hereby **GRANTED;**

(2) that the summary judgment motion of Defendants, Ashland Independent School District and Superintendent Larry Graves, [Record No. 34] is hereby **GRANTED;**

(3) that this action is hereby **DISMISSED** and **STRICKEN** from the docket; and

(4) that this is a **FINAL and APPEALABLE** Order.

14. The Court notes that the first paragraph of Plaintiff's complaint bases jurisdiction on Title VII and Title IX. Defendants did not address any Title IX claims in their pending motions. Perhaps this is because Title IX is not mentioned anywhere else in the complaint. Indeed, a separate section labeled "Causes of Action", makes a thorough list of Plaintiff's many legal theories but makes no mention of Title IX. Thus, the Court does not believe Plaintiff's complaint states a Title IX claim. Nevertheless, Title IX, like Section 1983 and KRS Ch. 344, follows Title VII's analytical framework. *Buntin v. Breathitt County Bd. of Educ.*, 134 F.3d 796, 800 (6th Cir.1998). Thus, the Court believes its previous determination of the Title VII claim would be equally dispositive of any Title IX claim and state civil rights claims as well.