Susan A. SCOTT

v.

CENTRAL SCHOOL SUPPLY, INC.

Civil Action No. 94–2.

United States District Court,
E.D. Kentucky,
Covington Division.

Feb. 6, 1996.

---

4. The rule of unanimity requires those defendants who have been served to consent to removal.

Barbara D. Bonar, Smith, Wolnitzek, Schachter & Rowekamp, Ft. Mitchell, KY, for Plaintiff.

Kathryn A. Quesenberry, Woodward, Hobson & Fulton, Louisville, KY, for Defendant.

## OPINION AND ORDER

BERTELSMAN, Chief Judge:

This matter comes before the court on a motion for judgment as a matter of law, made after a jury verdict for the plaintiff in the total amount of $266,143.00.[1]

Similar motions were timely made at the conclusion of the plaintiff's trial evidence and at the conclusion of all the evidence.[2] The court reserved on the motions at that time.[3] After careful review of the authorities and evidence, the court concludes that the motions must now be granted on all theories asserted by the plaintiff inasmuch as essential elements of both of the plaintiff's claims submitted to the jury were not supported by the evidence.

### FACTS

The evidence, construed most favorably to the plaintiff, as required in motions of this kind, showed the following facts:

Susan Scott, a white female, was employed by the defendant Central School Supply ("Central"), in 1985. She was originally employed as a sales clerk in the Louisville retail operation, but in late 1989 was promoted to the position of manager of a retail branch store in Florence, near Covington.

Central sells school supplies, including teacher's aids, at both the wholesale and retail levels. The store managed by plaintiff sold lesson books and other supplies directly to school personnel and school systems.

The sole owner and ultimate authority in the defendant's operations is its President, William H. McCord, Jr. During the early part of plaintiff's tenure, McCord's right-hand man was Vice–President Al Neef. Neef retired in 1993 and was succeeded by Frank Kebbell.[4]

---

1. Plaintiff's complaint alleged the following causes of action: 1) gender discrimination under Title VII and comparable Kentucky law; 2) age discrimination in violation of the ADEA; 3) disability discrimination in violation of the ADA; 4) violation of the Equal Pay Act; 3) breach of contract; and 4) intentional infliction of emotional distress. During the course of litigation, plaintiff withdrew her disability, Equal Pay Act, and breach of contract claims, and the court granted defendant's motion for summary judgment on the intentional infliction of emotional distress claim.

Thus, only the gender and age claims were submitted to the jury, who found in favor of the plaintiff as to gender discrimination and in favor of the defendant as to age discrimination.

2. Fed.R.Civ.P. 50(a).

3. *Id.* 50(b).

4. Although he did not retire until 1993, Neef underwent triple bypass surgery in 1992 and was actually relieved of his major responsibilities in May of that year.

In 1992, McCord became seriously ill and the day-to-day operations of the company were handled by Kebbell, although McCord was consulted daily during his recovery at the hospital and at home. He was still recuperating at home when plaintiff was terminated. The actual firing was done by Kebbell but approved by McCord, and occurred as follows:

Ever since her move to Florence, and perhaps before, plaintiff had experienced a continuing and recurring personality conflict with one Nick Discepoli. Discepoli's title was "Director of Stores and Purchasing," and he was plaintiff's immediate supervisor, at least *de jure*. Plaintiff testified that he was never her supervisor *de facto*, and indeed that she did not know he was her supervisor. She was under the impression she reported directly to McCord.

This situation led to a power struggle which ultimately resulted in plaintiff's unfortunate termination. Plaintiff testified that Discepoli was generally insensitive, abrupt and rude to his subordinates, most of whom were women. He was not rude to the men, most of whom were his superiors.

Plaintiff described in particular the following six incidents: (1) an incident in the Louisville office in 1988 or 1989 when Discepoli allegedly yelled at Scott and another woman to get out of his office; (2) an incident when Discepoli asked Scott to "humor" him while he moved a partition in her office in the Florence store; (3) a conversation with Scott and Steff Pallen in February 1993 in which Discepoli remarked that he had two store managers and only one (meaning Pallen, a male) understood him; (4) a conversation with Scott and Pallen in February 1993 in which Discepoli remarked to Pallen that if there was any fluorescent posterboard in the warehouse, then "she" (meaning Scott) could have it; (5) Discepoli's "late" Christmas advertising for the two stores; and (6) the exchange of memos in March 1993 in which Scott complained that Discepoli was "holding up" her orders, to which Discepoli responded

that he was "grow[ing] weary" of Scott's petty complaints.

Although Discepoli did not recall many of these incidents, their occurrence was not rebutted. There was no evidence that Discepoli or anyone else ever used sexual epithets or crude or obscene language, or engaged in the type of sexual innuendo that is so common in these cases.[5] There was no suggestion of any kind of *quid pro quo* scenario.

The conflict between plaintiff and Discepoli was brought to a head by an exchange of vituperative memos in March 1993 concerning some orders to replenish the stock of plaintiff's store. Each of them sent copies to several members of the company power structure.

When these memos crossed his desk, Kebbell was alarmed at the degree of hostility between two of his key subordinates. He summoned both of them to a meeting a few days later to "clear the air." The meeting, which took place on March 24, 1993, only made matters worse. According to plaintiff, at one point in the meeting Discepoli said he "hated" her because she refused to recognize his authority as her supervisor. Kebbell and Discepoli deny this language was used, but all are agreed the meeting was extremely heated and that both parties exchanged bitter remarks. Ultimately, plaintiff left the Louisville office very upset. There was no evidence that any remarks of a chauvinistic or sexual nature were made at this meeting.

Within a day or so, Kebbell sent a memo to both plaintiff and Discepoli directing that they thereafter communicate only in writing. He took this unusual action in the hope that things would cool down if they had no direct contact.

As it happened, an important two-day meeting of company sales personnel was to be held the next month in Louisville. Plaintiff was advised of the meeting and returned standard forms saying she would attend. This meeting was the critical sales meeting of the year. On the morning of April 26, 1993,

5. *See, e.g., Harris v. Forklift Sys., Inc.,* —— U.S. ——, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993); *Meritor Sav. Bank v. Vinson,* 477 U.S. 57, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986); *Pierce v. Com-* *monwealth Life Ins. Co.,* 40 F.3d 796 (6th Cir. 1994); *Kauffman v. Allied Signal, Inc., Autolite Div.,* 970 F.2d 178 (6th Cir.), *cert. denied,* 506

the first day of the meeting, plaintiff—without any advance notice—did not go to Louisville but instead remained in the Florence store. Kebbell directed Discepoli to call and see why she was not present at Louisville. Plaintiff advised him that she had sent a fax explaining why she wasn't there. Discepoli had not seen the fax.

After hanging up, Discepoli found the fax [6] and advised Kebbell of its contents. Kebbell himself then called plaintiff and emphasized the importance of the meeting. She told him that he could not expect her to attend a meeting at which Discepoli would be present.

Kebbell then directed plaintiff to attend a meeting the following Friday where Discepoli would not be present.[7] He consulted McCord, who advised him that plaintiff must attend required meetings. McCord and Kebbell drew up a job description to which plaintiff would have to adhere to retain her employment.

Plaintiff did come to the meeting the following Friday. Discepoli was not present. Kebbell presented her with the job description.[8] The third responsibility listed was to "[a]ttend meetings in Louisville or other locations as prescribed by Management of Central School Supply Company."

Plaintiff asked, "How many meetings would I have to attend?" Kebbell replied, "As many as I call." Plaintiff refused to accept the job description if it included attending meetings where Discepoli was present. She was thereupon terminated.[9] She appealed to McCord, but he affirmed Kebbell's decision.

### ANALYSIS

**1. THE JURY'S VERDICT OF DISCRIMINATORY DISCHARGE IS NOT SUPPORTED BY THE EVIDENCE.**

As the case at bar went to trial, Scott had established her prima facie case of discriminatory discharge under *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) and *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981).[10] Central, in turn, had proffered a legitimate nondiscriminatory reason for Scott's termination, namely, that she refused to accept a reasonable requirement of her job—to attend meetings with her supervisor. Thus, Scott's

---

U.S. 1041, 113 S.Ct. 831, 121 L.Ed.2d 701 (1992).

**6.** Plaintiff's fax was directed to the attention of "Frank & Nick" and stated:

Due to circumstances beyond my control I will not be at the meeting today or tomorrow.
This fax was received at the Louisville office at 8:38 a.m. on the morning of April 26, 1993.

**7.** Later that day, Kebbell followed up this phone conversation with a memo confirming that the meeting would take place on Friday, April 30, 1993 at 10:00 a.m. in Louisville.

**8.** The job description read:

—Carry out orders and directives of the Management of Central School Supply Company. Report directly to the Director of Stores.
—File reports and other sale information as required by Management of Central School Supply Company.
—Attend meetings in Louisville or other locations as prescribed by Management of Central School Supply Company.
—Conduct training and sales help for all Employees under the direct supervision of the Store Manager.
—Conduct self at all times in the best interest of Central School Supply Company.

—Ensure that all Employees and all physical facilities present themselves in the best interest of Central School Supply.
—Ensure that the Store is clean and neat inside and out at all times.
—Ensure that the store is well stocked and is presentable at all times.
If at any time the Manager, or the Manager personally knows of any Employee that cannot abide by the above rules, he or she is to notify Management of Central School Supply Company immediately.

**9.** Kebbell subsequently sent plaintiff a letter of termination, which read as follows:

Dear Susan:
This is to confirm our discussion in the conference room of Central School Supply Company on Friday morning, April 30, 1993. At this meeting I presented you a sheet containing the items for a job description for the store Managers, for Central School Supply Company. You indicated at this time that you could not abide by all items in this job description.
You leave me no choice but to terminate your employment with Central School Supply Company as of Friday, April 30, 1993.

**10.** She was a qualified female who had been replaced by a male as Florence store manager. A year or so later, the male was promoted and another female was appointed to this position.

burden at trial was to prove by a preponderance of the evidence that Central's proffered explanation was a pretext for discrimination. *Burdine,* 450 U.S. at 255–56, 101 S.Ct. at 1095.[11]

In *Manzer v. Diamond Shamrock Chem. Co.,* 29 F.3d 1078 (6th Cir.1994), the Sixth Circuit discussed how a plaintiff might carry her burden of demonstrating pretext. The court emphasized that to disprove the employer's proffered reason, the plaintiff must produce circumstantial evidence from which the jury can discredit it:

> The jury may not reject an employer's explanation, however, unless there is a sufficient basis *in the evidence* for doing so. To allow the jury simply to refuse to believe the employer's explanation would subtly, but inarguably, shift the burden of persuasion from the plaintiff to the defendant, which we must not permit.... Accordingly, once the employer has come forward with a nondiscriminatory reason for firing the plaintiff, **we hold that the plaintiff must produce sufficient evidence from which the jury may reasonably reject the employer's proffered explanation.**

*Id.* at 1083 (italicized emphasis in original) (emphasis added in bold) (citations omitted). The Sixth Circuit listed three showings that a plaintiff might make in order to persuade the jury that the employer should not be believed:

> To make a submissible case on the credibility of h[er] employer's explanation, the plaintiff is required to show by a preponderance of the evidence either (1) that the proffered reasons had no basis *in fact,* (2) that the proffered reasons did not *actually* motivate h[er] discharge, or (3) that they were *insufficient* to motivate discharge.

*Id.* at 1084 (emphasis in original) (internal quotations omitted).

In the case at bar, Scott attempted to prove pretext under the second approach[12] described in *Manzer.* Using this method,

> the plaintiff admits the factual basis underlying the employer's proffered explanation and further admits that such conduct *could* motivate dismissal. The plaintiff's attack on the credibility of the proffered explanation is, instead, an indirect one. In such cases, the plaintiff attempts to indict the credibility of h[er] employer's explanation by showing circumstances which tend to prove that an illegal motivation was *more* likely than that offered by the defendant. In other words, the plaintiff argues that the sheer weight of the circumstantial evidence of discrimination makes it "more likely than not" that the employer's explanation is a pretext, a coverup.... Accordingly, we hold that, in order to make this type of rebuttal showing, the plaintiff may not rely simply upon h[er] prima facie evidence but must, instead, introduce additional evidence of [gender] discrimination.

*Id.* (emphasis in original).

■ As evidence of pretext, Scott testified to the above listed six instances over as many years in which Discepoli allegedly treated her less favorably because she was a woman. In addition, Scott introduced the testimony of five female former Central employees as well as the testimony of Al Neef, former Central Vice–President, as evidence that Central treated women less favorably than men. However, with the exception of one comment by Neef that the processing of customer orders was "women's work," this testimony consisted only of generalized allegations of chauvinism on the part of Central male management. Each of the female employees also testified that Discepoli was rude to women at

---

11. Although the case at bar was submitted by agreement of the parties to the jury with a "mixed motives" instruction, the court should decide defendant's renewed motion for judgment as a matter of law by viewing the evidence as it existed at the close of trial, *prior* to submission to the jury. In fact, Scott did not produce direct evidence of discrimination so as to warrant "mixed motives" treatment. *Price Waterhouse v. Hopkins,* 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989). Thus, the court will consider the evidence at this juncture under a "pretext" analysis.

12. Scott did not deny that she failed to attend the management meeting in Louisville (the first showing), nor did she produce any evidence that other employees engaged in similar conduct but were not fired (the third showing). *See Manzer,* 29 F.3d at 1084.

Central but not to the male managers. However, there was no evidence that sexual remarks or epithets were ever addressed to Scott.

These witnesses further testified that Central employees were paid very poorly; however, they acknowledged that this was true of both male and female clerical and warehouse employees. There was no evidence of any instance of unequal pay for the same work.[13] None of these witnesses provided evidence of specific actions by Central management reflecting discriminatory animus, nor did Scott produce any evidence that such animus played a role in the decisionmaking process leading to her termination.

Evidence very similar to that presented by Scott led the Sixth Circuit to affirm a grant of summary judgment in favor of an employer in *Wienke v. Haworth, Inc.*, No. 92–1021, 1993 WL 6830 (6th Cir. Jan. 11, 1993). In *Wienke*, the plaintiff was terminated following a clash with her immediate supervisor over a memorandum she wrote concerning the supervisor's actions in disciplining an employee for whom she was responsible. The memorandum, which the plaintiff copied to her supervisor's superiors and in which she sharply criticized her supervisor's handling of the situation, was found to constitute insubordination, and the plaintiff was terminated. At trial, the plaintiff produced evidence of one derogatory comment by the supervisor and testimony of other employees about the company's generally discriminatory attitude toward women. The Sixth Circuit held, however, that such evidence was insufficient to create a triable issue on pretext:

> These statements are also the basis for Wienke's claim that Reed had a predisposition to discriminate against women and that he acted upon that predisposition in terminating her. The statements are contained in the affidavits of Deb Donaldson and Harley Bricker. **Donaldson stated that she once heard Reed yell at Wienke but never saw Reed yell at males in the office. She also stated ... that Reed regularly treated women more harshly and critically than men, lied, and did not like "confident" women.** Bricker stated that after Wienke had called in sick one day, Reed remarked, "Oh, it must be female problems again." Except for the quoted statement attributed to Reed, **the opinions of both affiants are generalized, isolated, conclusory, and unrelated to Wienke's firing.**

*Id.* at \*\*3 (emphasis added). In addition, the court found plaintiff's argument that any man who engaged in similar conduct would not have been fired to be "conclusory and plainly insufficient to raise a triable issue of pretext." *Id.* See also *Evans v. Jay Instrument and Specialty Co.*, 889 F.Supp. 302, 310 (S.D.Ohio 1995) (holding that "self-serving conclusory declarations of actual discrimination by the defendant's decision-makers" are insufficient to raise triable issue of pretext). As in *Wienke*, Scott's evidence in the case at bar amounts to nothing more than "conclusions and isolated instances," *id.*, that are insufficient as a matter of law to support the jury's verdict that Scott was terminated on account of her gender.[14]

Judgment as a matter of law should be granted when evidence weighs so heavily in favor of movant that reasonable minds could not come to a different conclusion. *Miller's Bottled Gas, Inc. v. Borg–Warner Corp.*, 56 F.3d 726, 734 (6th Cir.1995). To overcome such a motion (or a motion for summary judgment), plaintiff must present more than a mere scintilla of evidence to support her position; the mere possibility of a factual dispute is not enough. *Harrow Prod., Inc. v. Liberty Mut. Ins. Co.*, 64 F.3d 1015, 1019 (6th Cir.1995).

There is no evidence that gender bias played any part in Scott's termination. The only reasonable interpretation of the evidence is that the termination was caused by a personality conflict unrelated to gender between her and Discepoli, complicated by poor communication and management prac-

---

**13.** It is undisputed that Scott was paid the same salary—$27,000—as the male store manager, Steff Pallen.

**14.** In *Wienke*, the Sixth Circuit also held that plaintiff's evidence was insufficient to warrant treatment as a "mixed motives" case. *Id.*

tices and her own intransigence in refusing to attend required meetings.

There was no evidence that Discepoli was motivated by gender bias in his conflicts with plaintiff. Rather, he had been given a title but no authority by McCord, and he was trying to establish his position as Director of Stores. This situation was rife with possibilities for conflict.

But although Discepoli was demonized in plaintiff's proof, the uncontroverted evidence was that Kebbell was the one who made the determination to fire plaintiff. It was undisputed that Discepoli was not involved after the meeting of March 24. There was no evidence that Kebbell was motivated by any desire other than to enforce what he deemed to be company policy, as set by McCord. No one attributes any biased or rude remarks to him. His decision was ordered and confirmed by McCord, who had hired plaintiff and been her mentor.[15] Nor was there any evidence of any discriminatory acts by McCord, who had appointed several women to management and other positions.

## 2. THERE IS NO EVIDENCE TO SUPPORT THE HOSTILE ENVIRONMENT CLAIM.

■ Plaintiff's evidence, summarized above, falls far short of satisfying the criteria for a hostile environment sexual harassment claim. The primary Supreme Court case outlining the elements of this kind of claim is, of course, *Harris v. Forklift Systems, Inc.,* —— U.S. ——, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993), which clarified *Meritor Savings Bank v. Vinson,* 477 U.S. 57, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986).

The Sixth Circuit Court of Appeals has not had occasion to publish an opinion interpreting *Harris,* but the court notes its application in several unpublished opinions.

The most complete statement of the law following *Harris* appears in *Gebers v. Commercial Data Ctr.,* No. 93–4011, 1995 WL 9262 (6th Cir. Jan. 10, 1995). Because the

opinion is unpublished, it bears quoting at length:

We also find that summary judgment was properly entered on plaintiff's hostile work environment claim.

This circuit had required a plaintiff to prove five elements to prevail in a hostile work environment action. Since the Supreme Court's decision in *Harris v. Forklift Systems, Inc.,* —— U.S. ——, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993), a plaintiff must prove only the following four elements: 1) the employee was a member of a protected class; 2) the employee was subjected to unwelcomed sexual harassment in the form of sexual advances, requests for sexual favors, or other verbal or physical conduct *of a sexual nature;* 3) the harassment complained of was *based upon sex;* and 4) the existence of respondeat superior liability. See *id.*[, at ——, 114 S.Ct.] at 371; *Rabidue v. Osceola Ref. Co.,* 805 F.2d 611, 619–20 (6th Cir.1986), cert. denied, 481 U.S. 1041, 107 S.Ct. 1983, 95 L.Ed.2d 823 (1987).

Further, the plaintiff must prove that the work environment is one a reasonable person would perceive as hostile or abusive. *Harris,* —— U.S. ——, 114 S.Ct. 367 (1993). This objective component requires that the conduct complained of be " '*severe or pervasive*' " and not encompass the " '*mere utterance of an ... epithet which engenders offensive feelings* in a[n] employee.' " *Id.,* at ——, 114 S.Ct. at 370 (citation omitted).

Plaintiff claims she was subjected to a sexually hostile work environment because after she broke things off with Klan, he would not speak to her, avoided her, and would not voluntarily help her on the job. She also claims that on one occasion, Klan referred to either her or to another female employee who was seated near her as a "slut." However, as the district court found, the single incident of Klan calling plaintiff or another female a slut on one occasion is insufficient evidence from which a jury might infer the existence of a sexu-

---

**15.** *Cf. Buhrmaster v. Overnite Transp. Co.,* 61 F.3d 461 (6th Cir.1995) (affirming trial court's use of "same actor" instruction allowing jury to infer lack of discrimination from fact that same individual both hired and fired employee), *cert. denied,* —— U.S. ——, 116 S.Ct. 785, 133 L.Ed.2d 736 (U.S.1996).

ally hostile work environment. *All of the other "evidence" which plaintiff points to is "sex neutral."*

*Id.* at **2–3 (emphasis added).

Further, in *Walker v. Social Health Ass'n of Greater Cincinnati, Inc.,* No. 94–3801, 1995 WL 758463 (6th Cir. Dec. 21, 1995), the court emphasized that *Harris* requires that plaintiff prove as an element of this kind of claim that the "comments and actions [s]he complains of were *more than merely offensive,* but rather were 'severe or pervasive enough to create an objectively hostile or abusive work environment—an environment that a reasonable person would find hostile or abusive.' " *Id.* at *2 (quoting *Harris,* —— U.S. at ——, 114 S.Ct. at 370) (emphasis added).

And in *McGee v. Genesco, Inc.,* No. 92–6230, 1994 WL 4721 (6th Cir. Jan. 6, 1994), the court observed:

> McGee's assertion that she was treated disrespectfully by two male employees, termed "harassment" in her brief to this court, does not set forth an actionable claim for sexual harassment. McGee does not claim that these employees behaved better with men than with her, *does not allege that their remarks were gender-based,* and does not claim that their behavior was pervasive and consistent. The facts asserted, accepted as true, do not demonstrate a *workplace "permeated with 'discriminatory intimidation, ridicule, and insult,'* that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment'[.]".

*Id.* at **6 n. 1 (quoting *Harris,* —— U.S. at ——, 114 S.Ct. at 370) (emphasis added).

When Ms. Scott's evidence is viewed in the light of the criteria found in these authorities, it is clear that her proof fails as to some of the required elements for a hostile environment claim, namely, that the conduct complained of be of a sexual nature and that it be based upon sex. Conduct which is "sex neutral" is not to be considered. *Gebers,* 1995 WL 9262 at **3. Nor are acts of personal animosity, in and of themselves, sexual harassment. *See Rothenbusch v. Ford Motor Co.,* No. 93–3945, 1995 WL 431012, at **3 (6th Cir. July 20, 1995), *petition for cert. filed,* 64 U.S.L.W. 3439 (U.S. Oct. 17, 1995) (No. 95–972).

Furthermore, plaintiff has failed to meet the "objective component" required by *Harris* in that the comments were not severe or pervasive, as defined in the above authorities. *Harris,* —— U.S. at ——, 114 S.Ct. at 370.

The only reasonable construction of the evidence in this case is that plaintiff's problems with Discepoli were based on a personality conflict that was aggravated by the company's poor management practices in failing to clearly delineate the chain of command. As has been stated, Discepoli attempted to supervise plaintiff when she was not aware that he was her supervisor, a situation fraught with conflict potential.

There was no evidence that any comments made by Discepoli in the course of the conflicts arising out of this situation were based on sex or were of a sexual nature. They were clearly "sex neutral."

### CONCLUSION

Plaintiff's loss of her position, which she valued highly, was indeed unfortunate. Perhaps the jury felt that she had been treated unfairly. Defendant's actions may have been unfair, but there was no evidence that they were discriminatory. Rightly or wrongly, the law does not protect an employee from unfairness but only from discrimination.

Therefore, the court being advised,

**IT IS ORDERED** as follows:

1. That the motion of defendant for oral argument on post-trial motions (Doc. # 90) be, and it is, hereby **denied;**

2. That the post-trial motion for judgment as a matter of law (Docs. # 88–1) be, and it is, hereby **granted;**

3. That the alternative motion for new trial (Doc. # 88–1) be **conditionally granted** as the above Opinion shows the verdict was against the weight of the evidence;

4. That the motion of defendant to alter or amend judgment (Doc. # 88–2) be, and it is, hereby **denied as moot;**

5. That the application of plaintiff for attorney's fees (Doc. # 92) be, and it is, hereby **denied;**

6. That the motions of defendant for disclosure of fee agreement (Doc. # 97), and for leave to file motion to strike plaintiff's request for attorney's fees (Docs. # 97 and # 98) be, and they are, hereby **denied as moot;**

7. That the motion of defendant to strike plaintiff's application for attorney's fees and expenses (Doc. # 99) be, and it is, hereby **denied as moot;**

8. That the Bill of Costs submitted by plaintiff (Doc. # 94) be, and it is, hereby **denied;** and

9. That a separate Judgment dismissing the complaint shall enter concurrently herewith.