**Lori Jean WARG, Plaintiff,**

**v.**

**Janet RENO, Attorney General, et al., Defendants.**

**No. 4:97–CV–3150.**

United States District Court,
N.D. Ohio,
Eastern Division.

Sept. 10, 1998.

James R. Wise, Sr., Youngstown, OH, James L. Kestell, Kestell & Associates, Falls Church, VA, for Lori Jean Warg.

Michael Anne Johnson, Office of U.S. Attorney, Cleveland, OH, for Louis J. Freeh, Director Federal Bureau of Investigation, Janet Reno, Attorney General and Department of Justice.

## OPINION AND ORDER

GWIN, District Judge.

On July 27, 1998, Defendants U.S. Attorney General Janet Reno and the U.S. Department of Justice filed a motion to dismiss or for summary judgment in this sexual harassment action [Doc. 18].[1] In ruling on this motion, the Court must determine whether Plaintiff Lori Warg can show the defendants were responsible for an alleged hostile work environment under title VII of the Civil Rights Act of 1964, 42 U.S.C.

---

1. On February 9, 1998, former Defendant FBI Director Louis Freeh moved to dismiss plaintiff's complaint [Doc. 3]. Director Freeh subsequently was removed as a defendant when the plaintiff amended her complaint [see Doc. 15]. This first motion to dismiss will be denied as moot.

§§ 2000e *et seq.* and a violation of the Privacy Act, 5 U.S.C. § 552a.

The Court finds that a portion of her claim related to her supervisor's 1994 assault was resolved through a settlement agreement between Warg and the FBI and thus cannot be raised in Plaintiff Warg's hostile environment claim. Warg's general claim that defendants failed to assure her safety and privacy interests must be dismissed for failure to exhaust administrative remedies. The remaining allegation—plaintiff's 1996 discrimination complaint about purported offensive statements by a colleague—was neither pervasive nor severe enough to trigger liability under Title VII. The Court grants defendant's motion for summary judgment on the Title VII claim. Finally, the Court retains supplemental jurisdiction over plaintiff's Privacy Act claim but transfers it to the District of Columbia, the court of proper venue.[2]

### I. The Action

On December 3, 1997, Plaintiff Lori Jean Warg filed this action against Louis J. Freeh, the Director of the Federal Bureau of Investigation. Warg's amended complaint replaced Defendant Freeh with Defendants Attorney General Janet Reno and the U.S. Department of Justice. As the FBI is a government bureau falling under the aegis of the Department of Justice, the Attorney General, rather than the FBI Director, is the proper defendant in this action. *See* 42 U.S.C. § 2000e–16(c); *Hancock v. Egger,* 848 F.2d 87 (6th Cir.1988).

Claim I of the amended complaint, against the Attorney General, alleges sex discrimination under Title VII of the Civil Rights Act, 42 U.S.C. § 2000e *et seq.* Claim II, against the Department of Justice, alleges a violation of Warg's rights under the Privacy Act, 5 U.S.C. § 552a(b). Plaintiff Warg also seeks damages for intentional discrimination under the provisions of 42 U.S.C. § 1981a.

### II. Factual Background

In 1994, the FBI employed Warg as an intelligence analyst at the National Drug In-telligence Center in Johnstown, Pennsylvania. Her supervisor was Michael F. Blair.

Following a September 17, 1994, dinner with co-workers at a local restaurant, Warg and a co-worker went to Blair's home to view special agent training tapes. Blair and his wife invited Warg to spend the night. During the early morning of September 18, 1994, Blair allegedly entered the guestroom where Warg was asleep and reportedly sexually assaulted her.

Warg reported the incident to an Equal Employment Opportunity (EEO) counselor at the National Drug Intelligence Center. She also filed an administrative complaint with the FBI's Equal Employment Opportunity office alleging sexual discrimination and harassment.

After investigation, the FBI and Plaintiff Warg settled her EEO complaint. Under this agreement, the FBI promised that appropriate action would be taken against Blair. The FBI further agreed to pay her medical expenses to the date of the settlement. To memorialize their agreement, Warg and the FBI signed a settlement agreement which the FBI prepared. The settlement agreement provided:

"[T]he Complainant agrees to forebear any right she may now possess to reinstitute or initiate any future claims or proceedings before the Equal Employment Opportunity Commission (EEOC) and/or the U.S. Department of Justice involving the same allegations or subject matter of the aforementioned Complaint; nor will she pursue any appeal, or have any one pursued on her behalf, to the EEOC, or initiate a lawsuit in any U.S. District Court, ... pertaining to any and all acts or omissions of the FBI that gave rise to her filing the aforementioned Complaint."

Plaintiff claims the FBI assured her that the EEO process was confidential and that the investigation and final outcome would be treated as confidential and private under the Privacy Act. Yet, the April 1995 settlement says nothing about privacy. Moreover, the settlement agreement says, in part:

---

**2.** The Court also will deny the plaintiff's motion to amend her complaint for a second time. Plaintiff sought leave of court after the court's deadline had passed for filing dispositive motions and only weeks before the scheduled start of trial. *See* Doc. 20.

The parties agree that the above terms and conditions constitute the complete agreement reached by the parties in this matter, and that this constitutes a total settlement involving any disputes surrounding any and all actions and incidents which give rise to the filing of the Complaint in this action by the Complainant. The Complainant agrees that by signing this Agreement, she forever releases the FBI, its agents and employees from any and all liability for any cause whatsoever ... arising directly or indirectly from the facts and circumstances which gave rise to the Complaint.

 &ast;  &ast;  &ast;  &ast;  &ast;  &ast;

The terms of this Agreement constitute the entire understanding among the parties and no statement, remark, agreement or understanding, oral or written, which is not contained herein, shall be recognized or enforced.

The settlement agreement required the FBI to investigate Warg's sexual harassment claim against her supervisor. Under the agreement and if indicated by the facts, the FBI's Office of Professional Responsibility was to take appropriate disciplinary action. After the settlement agreement was signed, the FBI conducted this investigation. After this investigation, the FBI terminated Blair's employment.[3]

As a result of the 1994 incident, plaintiff says she suffered from recurring anxiety, depression, and suicidal thoughts. Plaintiff took extended leaves of absence to her father's home in Massachusetts in an effort to cope with the stress and depression. Plaintiff says her emotional state was further affected by Blair's attempts to influence her reporting of the incident and by harassing telephone calls from Blair's wife.

After plaintiff returned to work, she completed special agent training. In February 1996 she was assigned to the Youngstown, Ohio, FBI office.

On June 30, 1996, plaintiff worked surveillance for a special operation with several other agents from Youngstown and other offices. After completing surveillance, the operation's leaders announced that everybody participating in the day's events was encouraged to meet for dinner and drinks.

Plaintiff attended the social gathering along with many of the other agents. While there, plaintiff entered into a conversation with other agents from the Youngstown office about concerns she had with prioritizing assigned cases. As the gathering ended and agents were leaving, Warg sought advice from one of the Youngstown office's senior agents, Robert Kroner.

Plaintiff asked Kroner how she should prioritize a sexual abuse case assigned her. The case involved a former spouse who was threatening severe violence to his ex-wife and children. Plaintiff says she expressed concern that she was not able to devote enough time to the case because non-related assignments were given higher priority.

Plaintiff alleges that Agent Kroner responded to the effect, "What's this really about, Lori? It's about Johnstown, isn't it?" Plaintiff says Kroner told her that some agents had heard that plaintiff was having an affair with her supervisor in Johnstown and that when his wife found out, plaintiff claimed she had been raped. When Warg asked Kroner who told him this, Kroner replied that he could not tell her.

Warg alleges that she became despondent and considered suicide. Plaintiff says information about the alleged rape was being circulated around the FBI. She claims she fears these rumors would continue to follow her throughout her career.

On July 8, 1996, plaintiff met with Supervisory Special Resident Agent Frederick Snellings, the head of the Youngstown office. She advised Snellings of Kroner's statements. Plaintiff also told Snellings briefly about the rape. Plaintiff says she became emotionally distraught during the meeting. She alleges

---

**3.** Blair subsequently charged the FBI with sex and race discrimination in a Title VII action filed in the U.S. District Court for the Western District of Pennsylvania. That court granted the government's unopposed motion to dismiss or for summary judgment. *Blair v. Reno,* CA 97–238J (W.D.Pa. Jan. 17, 1998).

that Snellings asked her whether she indeed had dated Blair.

Plaintiff Warg contacted an EEO counselor and timely filed a second complaint of sex discrimination against the FBI for the June 30, 1996, conversation with Kroner.

Plaintiff Warg maintains Agent Kroner's statements that night were hostile and malicious. She claims his comments were calculated to challenge her claim of sexual assault and to provoke a reaction from her. Kroner, who had heard about Warg's situation from another agent assigned to the Johnstown office, does not deny the conversation. However, he testified that Warg brought up the rape incident and that he was more diplomatic and reluctant to speak than Warg alleges.

Plaintiff claims "flashbacks" about the rape. She asserts she has been unable to continue work and has incurred the need for psychological treatment.

After exhausting her administrative remedies subsequent to the June 1996 conversation with Kroner, Warg filed the instant action in federal court.

### III. Converting Motion to Dismiss into Summary Judgment

A court properly grants a Rule 12(b)(6) motion to dismiss only if it appears that the plaintiff can prove no set of facts that would entitle her to relief. *Hishon v. King & Spalding*, 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984). The complaint is construed in the light most favorable to the plaintiff and the court accepts as true all of the plaintiff's well-pled factual allegations. *Ludwig v. Board of Trustees of Ferris State Univ.*, 123 F.3d 404, 408 (6th Cir.1997).

The Court converts the motion to dismiss into one for summary judgment when it re-

views exhibits attached to the motion to dismiss.[4] *See Wright v. Holbrook,* 794 F.2d 1152, 1156 (6th Cir.1986); Fed.R.Civ.P. 12(b). The Court has reviewed a number of depositions, affidavits, and other Rule 56 documents, and acts to grant summary judgment rather than dismiss the amended complaint.

### IV. Components of Plaintiff's First Claim

In the first claim of Warg's amended complaint she essentially asserts two Title VII violations. First, she makes claim about the 1994 incident in Pennsylvania. Second, she makes claim about the 1996 after-hours conversation with a co-worker in Ohio. Each was the subject of separate EEO complaints. Plaintiff attempts to show that both EEO complaints support her third more generalized sex discrimination claim of a hostile work environment.

In her amended complaint Warg says that her employer created a hostile environment "by assigning her to work under an individual who had previously demonstrated a proclivity to engage in sexually offensive behavior" without any notice or warning to her about her supervisor's tendencies.

She also claims that her employer created a hostile work environment

by allowing members of managment [sic] and senior agents to discuss the circumstances leading to her assault in Johnstown amongst themselves and by not maintaining plaintiff's privacy rights within the workplace. By providing information about the incident to other agents, and by speculating whether she had an affair with Blair prior to being raped, defendant's management created an environment hostile to plaintiff's privacy rights and failed to take appropriate steps necessary to prevent such lies, rumors, gossip and hearsay

---

4. Defendants filed a motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6) or for summary judgment pursuant to Fed.R.Civ.P. 56. As the language of the Rule indicates:

> If, on a motion ... to dismiss for failure of the pleadings to state a claim ... matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56, and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56.

Fed.R.Civ.P. 12(b).

It appears that both parties treated this motion as a motion for summary judgment. The plaintiff recognized the defendants alternative motion for summary judgment in its caption and included an affidavit by the plaintiff, deposition testimony, agency records, and psychiatric counseling records in support of its opposition to defendants' motion. Both parties addressed the issues on summary judgment grounds.

from creating an extremely volatile and humiliating experience for plaintiff as occurred on June 30, 1996.

Amended Complaint, ¶ 28.

Aside from these two incidents, Warg also claims that the following conduct of the defendants created a hostile work environment for Warg because of her sex: failing to provide female employees with a safe work environment, failing to properly screen supervisory agents to prevent vulnerable females from being assigned to work for agents who have demonstrated proclivities hostile to female employees, transferring offensive male agents from one office to another to avoid dealing with the problem, and failing to take appropriate action in the office even after a sexual assault incident occurs so that all employees are instructed on the privacy rights of the female victim to such violent and unwelcome attacks.[5]

In ruling on her Title VII claim, the Court will examine the two incidents for which Warg submitted administrative complaints and her more general charge of discrimination.

### V. Settlement Agreement

■ The Court finds that the portion of Claim I based on the 1994 assault is stopped by the terms of the settlement agreement Warg entered into with the FBI. The settlement agreement precludes Warg from filing "a lawsuit in any U.S. District Court ... pursuant to Title VII ... *pertaining to any and all acts or omissions of the FBI that gave rise to her filing* the aforementioned Complaint." (Doc. 3, exh. C, ¶ 4.) Further, the parties agreed on a total settlement. Warg released the FBI from liability. The release was a "complete and legal bar" to any claims Warg had against the FBI in connection with the Blair assault. *Id.* at ¶¶ 5, 6.

The settlement agreement requires dismissal of any claim Warg may have against the government relating to the 1994 assault. The Court grants the defendants summary judgment on the portion of Warg's amended complaint arising from the 1994 sexual assault.

### VI. Title VII Hostile Environment

The remaining components of Warg's Title VII claim before this Court are the FBI colleague's comments on June 30, 1996, and her more generalized charge that management created a hostile work environment.

■ The sole issue accepted for investigation in Warg's 1996 administrative complaint, according to the EEO officer was:

Whether [Warg] was harassed based on her sex when on June 30, 1996, a senior agent advised her that he and others were told that [Warg] had been dating her supervisor and "screwing around," and that when the supervisor's wife found out and made a scene, [Warg] claimed that she had been raped by the supervisor.

(Doc. 3, exh. B). .

Issues not raised in Warg's 1996 administrative complaint cannot be raised in this Court. "The judicial complaint must be limited 'to the scope of the EEOC investigation reasonably expected to grow out of the charge of discrimination.'" *Ang v. Procter & Gamble,* 932 F.2d 540, 545 (6th Cir.1991); *see also Mayfield v. Meese,* 669 F.Supp. 1123, 1127 (D.D.C.1987); *Johnson v. United States Dep't of Health and Human Services,* 1992 WL 675943, * 6 (N.D.Ohio Sept.17, 1992), *aff'd,* 30 F.3d 45 (1994).

A review of the submitted record shows that Warg did not raise administratively her more generalized claim that defendants failed to protect her safety and privacy interests. The Court finds that the matters raised in Paragraph 29 of her amended complaint—failing to provide a safe environment, to screen supervisors, to discipline offensive agents rather than transferring them, and to instruct agents on the privacy rights of fellow agents—do not arise reasonably from the administrative complaint Warg filed.

Information about the 1994 incident and the rumors that circulated among plaintiff's co-workers no doubt give context to the remarks made by Agent Kroner in 1996 and its effect on Warg. However, such information does not transform a single conversation into a series of incidents for the purposes of a

---

5. Amended complaint, Doc. 15, ¶ 29.

hostile environment claim. Thus, the Court is left to decide whether defendants can be held liable for creating a hostile environment in light of Kroner's June 1996 comments standing alone.

Title VII of the Civil Rights Act of 1964 makes it "an unlawful employment practice for an employer ... to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1).

The phrase 'terms, conditions, or privileges of employment' evinces a congressional intent 'to strike at the entire spectrum of disparate treatment of men and women' in employment, including "requiring people to work in a discriminatorily hostile or abusive environment." *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993) (citations omitted).

■ Plaintiff Warg alleges a hostile work environment created by a co-worker. In order to prevail under Title VII, she must show that: (1) she was a member of a protected class; (2) she was subjected to unwelcome sexual harassment; (3) the harassment complained of was based upon sex; (4) the harassment unreasonably interfered with the plaintiff's work performance and created a hostile work environment; and (5) the defendant employer "knew or should have known of the charged sexual harassment and failed to implement prompt and appropriate corrective action." *Blankenship v. Parke Care Centers, Inc.*, 123 F.3d 868, 872 (6th Cir.1997) (citations and internal quotation omitted), *cert. denied,* —— U.S. ——, 118 S.Ct. 1039, 140 L.Ed.2d 105 (1998).

■ Where a plaintiff fails to allege or cannot establish any one of the five elements of a hostile work environment sexual harassment claim, dismissal for failure to state a claim is warranted. *Fleenor v. Hewitt Soap Co.*, 81 F.3d 48, 49 (6th Cir.), *cert. de-*

*nied,* —— U.S. ——, 117 S.Ct. 170, 136 L.Ed.2d 112 (1996). The Court finds that Warg cannot establish two of the five elements.[6]

■ Agent Kroner's version of the conversation in question differs from the plaintiff's, though the Court need not resolve any discrepancies to render judgment.

Kroner states he had no idea that Warg was concerned about a domestic violence case on June 30, 1996. He testified that Warg, already distraught, brought up the rape incident and asked him whether he was aware of "what had happened in Johnstown." After some hesitation, Kroner said he had heard. When Warg asked for details, Kroner responded that Warg's "supervisor [in Johnstown] was separated from his wife and that Lori may have been seeing him, and that when the supervisor was making attempts to get reconciled with his wife, Lori didn't want to see him anymore ... and that something must have happened one particular evening ...[because Lori was later convinced by somebody] to file an allegation of rape as to what had happened." Warg replied that this version of events was not true. She told Kroner that she was raped while dog-sitting for a husband and wife when they returned home late one night.

Kroner testified that he heard about the assault from James Folsom, an FBI agent in Johnstown. Kroner worked with Folsom on a case, shortly after learning Warg was assigned to Youngstown. Kroner states that he told other agents in the office that Warg had been the victim of a crime so that they would be sensitive to the issue.

Warg testified that the issue under investigation as the result of her second EEO charge was

> my belief that I was discriminated against based on sex when a Senior Special Agent on June 30, 1996, told me that I had been dating a supervisor and "screwing around,"

---

**6.** The government acknowledges that Warg is a member of a protected class (Element 1) and concedes only for purposes of this motion that a rumor of a person having an intimate relationship with another is sexual in nature (Element 2). The Court therefore assumes that plaintiff can show the harassment was based upon sex (Element 3). *See McDonnell v. Cisneros,* 84 F.3d 256, 259–60 (7th Cir.1996); *Jew v. University of Iowa,* 749 F.Supp. 946, 958–59 (S.D.Iowa 1990) (rumors of sexual liaisons with supervisor based on plaintiff being a woman).

and when the supervisor's wife found out and made a scene, I claimed that I had been raped by the supervisor.

Courts have ruled that in sexually hostile work environment cases the conduct in question must be viewed both objectively and subjectively. "The conduct must be severe or pervasive enough to create an environment that a reasonable person would find hostile or abusive, and the victim must subjectively regard that environment as abusive." *Black v. Zaring Homes, Inc.*, 104 F.3d 822, 826 (6th Cir.), *cert. denied,* — U.S. —, 118 S.Ct. 172, 139 L.Ed.2d 114 (1997) (*citing Harris v. Forklift Sys.*, 510 U.S. 17, 21–22, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993)). A non-exhaustive list of relevant factors includes:

> [T]he frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's performance.... But while psychological harm, like any other relevant factor, may be taken into account, no single factor is required.

*Harris*, 510 U.S. at 23, 114 S.Ct. 367.

■ Isolated incidents must be extremely serious to rise to the level of discriminatory changes in the "terms and conditions of employment." *Faragher v. City of Boca Raton*, — U.S. —, —, 118 S.Ct. 2275, 2283, 141 L.Ed.2d 662 (1998);[7] *see also Highlander v. K.F.C. Nat'l Management Co.*, 805 F.2d 644, 649–50 (6th Cir.1986) (isolated incident or comment insufficient for hostile work environment claim).

■ While verbal conduct alone can be sufficient for liability on a hostile work environment claim, such speech still has to meet these rigorous standards. The Sixth Circuit overturned a jury verdict when the verbal conduct in question did not meet the "severe or pervasive" standard. *Black*, 104 F.3d at

826 (though comments sex-based, evidence held insufficient to support finding they were severe or pervasive enough to create an objectively hostile work environment); *see also Baskerville v. Culligan Int'l Co.*, 50 F.3d 428 (7th Cir.1995); *Highlander*, 805 F.2d at 649–50 (hostile environment claims are characterized by varied combinations and frequencies of hostile sexual exposures); *Raines v. City of Kimball, Tenn.*, 916 F.Supp. 719, 721 (E.D.Tenn.1996) (plaintiff cannot rely on single isolated incident to prove sexual harassment but must show pattern or practice of harassment against her); *Scott v. Central School Supply, Inc.*, 913 F.Supp. 522, 528–29 (E.D.Ky.1996) (same), *aff'd*, 121 F.3d 709, 1997 WL 420505 (TABLE) (6th Cir.1997); *Garcia v. ANR Freight System, Inc.*, 942 F.Supp. 351, 356 (N.D.Ohio 1996) (three sex-based incidents involving a co-worker during five-day orientation did not permeate the workplace creating an abusive work environment).

On the record submitted, the Court does not find any version of Agent Kroner's conversation with the plaintiff on June 30, 1996, severe or pervasive enough to establish liability under Title VII. Nearly two years after her assault, Warg focuses on a single conversation in a bar with a co-worker. Warg admits that prior to June 30, 1996 (the last day she worked), no individual in the FBI's Youngstown office did anything that she would describe as creating a hostile work environment on account of her sex. In fact, Warg testified that her working relationship with Kroner, whose comments provided the basis for the 1996 complaint, was "very professional." (Doc. 18, exh. G at 191–92). Warg was not even aware that her colleagues knew anything about the 1994 incident until her conversation with Kroner, because no one ever talked about it to her.

While Plaintiff Warg was upset by Kroner's comments, an objective, reasonable factfinder could not conclude that Kroner's state-

---

7. In *Faragher*, the Court explained this approach: These standards for judging hostility are sufficiently demanding to ensure that Title VII does not become a "general civility code." Properly applied, they will filter out complaints attacking "the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing." We have made it clear that conduct must be extreme to amount to a change in the terms and conditions of employment, and the Courts of Appeals have heeded this view.
118 S.Ct. at 2283–84 (citations omitted.)

ments that night so permeated Warg's work environment with discriminatory intimidation, ridicule, and insult so that the conditions of Warg's employment were altered and an abusive working environment was created.

■■■ With regard to the last element of a Title VII claim, Plaintiff Warg is unable to establish employer liability. Under existing Sixth Circuit authority, "when an employer responds to a charge of co-worker sexual harassment, the employer is liable only if its response manifests indifference or unreasonableness in light of the facts the employer knew or should have known." *Blankenship*, 123 F.3d at 873. Thus, a Title VII plaintiff must show the defendant employer "knew or should have known of the charged sexual harassment and failed to implement prompt and appropriate corrective action." *Id.* at 872.[8]

Plaintiff Warg does not assert that defendant failed to respond to her 1996 complaint. In fact, she reported the incident to her supervisor, Agent Snellings. Agent Snellings then contacted his supervisor, Special Agent in Charge Van A. Harp. Agent Harp attests that he contacted Warg to discuss the incident, encouraged her to reconsider her letter of resignation, offered to transfer her to another office if that would help, and assured her that he would obtain medical help for her. (Doc. 18, exh. J at 3). Harp and Warg do not dispute that Warg refused both the offer to transfer and FBI psychological counselling. *Id.* at 4; Doc. 18, exh. G at 271–72. Plaintiff Warg was subsequently treated by her own psychiatrist. (Doc. 23, exh. 1, ¶ 17). Agent Harp also claims that Warg made no mention of her suicidal thoughts or attempt at suicide and that he had no knowledge of it until the taking of his affidavit for purposes of this lawsuit.

Plaintiff does assert that Agent Kroner was not disciplined after his comments to her were reported to the FBI. But Agent Harp asserts that upon learning of the 1996 incident, he reprimanded Agent Kroner and counselled him to be more sensitive in light of Warg's experience as a crime victim. Agent Kroner says he took his conversation with Harp as a reprimand. (Doc. 18, exh. H at 25–26, 61–62). Plaintiff argues only as to the characterization, not the content, of Harp's and Kroner's conversation.

■■■ In essence, Plaintiff Warg argues that the FBI's response described above was inadequate to address her complaint. But even if the FBI exhibited negligence in response to her complaint, "mere negligence as to the content of [the employer's] response cannot be enough to make the employer liable." *Blankenship*, 123 F.3d at 873. "When an employer implements a remedy, it can be liable for sex discrimination in violation of Title VII only if that remedy exhibits such indifference as to indicate an attitude of permissiveness that amounts to discrimination." *Id.* A determination of the appropriateness of an employer's response depends upon the frequency and severity of the alleged harassment. *Id.* at 872.

Here, Plaintiff complained to her supervisor, Snellings, about the conversation with Kroner and alleges that she informed him how upset it made her. Thus, on the evidence presented, at the time plaintiff reported the 1996 incident, it appears that the FBI

8. Employer liability in hostile work environment claims may undergo refinement in view of recent Supreme Court decisions. In *Faragher v. City of Boca Raton*, —— U.S. ——, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998) and *Burlington Industries, Inc. v. Ellerth*, —— U.S. ——, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998), the Supreme Court afforded employers an affirmative defense in Title VII cases where they are asserted to be vicariously liable for a sexually hostile work environment. Under both *Faragher* and *Ellerth*, under certain circumstances an employer can escape liability if it shows two necessary elements: (a) the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) the employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by employer or to avoid harm otherwise. *Faragher*, —— U.S. at —— – ——, 118 S.Ct. at 2292–93.

In the present case, the Court follows the *Blankenship* standard for two reasons. First, both the *Faragher* and *Ellerth* decisions were directed at cases involving harassment by supervisors with "immediate (or successively higher) authority over the employee," *id.* 118 S.Ct. at 2293, but Agent Kroner was only a co-worker of Plaintiff Warg. Second, any affirmative defense analysis would not be helpful here because defendant does have policies against sexual harassment and plaintiff did file and pursue remedies made available to her by defendants.

knew only about the single incident with Kroner and that his comments were upsetting because they awakened painful memories for plaintiff of a rape two years before. The FBI acted on her report by looking into the incident and directing Agent Kroner to change his behavior. The FBI also offered several options to plaintiff for dealing with the trauma she claimed she was experiencing, all of which plaintiff refused.

Plaintiff Warg offers no evidence that anyone at the FBI knew the severity of her response (to the point of suicide attempt) to Kroner's comments until well after her conversation with Snellings. In light of what the FBI knew at the time it responded, Plaintiff Warg's assertion that the FBI response was inadequate cannot be supported.

Because Warg cannot establish two elements of her hostile environment claim. The Court enters summary judgment in favor of the Defendant Attorney General on Warg's Title VII claim.

### VII. Privacy Act

█ An action to enforce the Privacy Act can be brought in one of four places: in the district where the complainant resides, where she has a principal place of business, where the agency records at issue are situated, or in the District of Columbia. 5 U.S.C. § 522a(g)(5). Plaintiff Warg resides in Maryland and has no principal place of business. The agency records at issue are situated in Washington, D.C. Thus, this Court lacks original jurisdiction over Plaintiff Warg's Privacy Act claim.

Because plaintiff's Privacy Act claims are closely related to her Title VII claim, this court exercised supplemental jurisdiction over the Privacy Act claim pursuant to 28 U.S.C. § 1367(a). Having dismissed Plaintiff Warg's Title VII claim, the court has discretion to decline supplemental jurisdiction over

non-original claims pursuant to Section 1367(c).

The Court recognizes supplemental jurisdiction over the claim, but finds the Northern District of Ohio to be an improper venue. This Court may transfer this case to a district where the action could have been brought if transfer would be "in the interest of justice." 28 U.S.C. § 1406(a). In light of the fact that plaintiff resides in Maryland,[9] the agency records are located in Washington, D.C.,[10] the defendants are headquartered in Washington, D.C.,[11] and the Privacy Act specifically declares the District of Columbia as proper venue, this Court finds that transfer to the U.S. District Court for the District of Columbia would be in the interest of justice.

### IX. Conclusion

Accordingly, the Court grants the defendants' motion for summary judgment on its Title VII claim and retains supplemental jurisdiction over plaintiff's Privacy Act claim. The Court orders that plaintiff's Privacy Act claim be transferred, in the interests of justice, to the U.S. District Court for the District of Columbia.

IT IS SO ORDERED.

---

9. Although it is not clear how close plaintiff's residence is to the Washington D.C. area, plaintiff has requested that venue be transferred to the U.S. District Court for the District of Columbia upon the Court's declining jurisdiction. (Doc. 8 at 12, n. 6).

10. Although many of the documents provided by defendants do not specify Washington, D.C. as their place of origin, the affidavits accompanying them were signed by agents of defendants who

had control over their release from offices in Washington, D.C. In any event, other considerations are sufficient to justify transfer in light of the fact that records, wherever located, are easily copied.

11. Defendants urge the Court to use an improper venue finding to dismiss the Privacy Act claim altogether. (Doc. 18 at 17–18).